### In re EMPRESAS INABON, INC., Debtor.

### In re Alfonso Hernandez Torres and Ramonita Ortiz Vazquez, Debtors.

### In re Alfonso A. Hernandez Ortiz, Debtor.

Empresas Inabon, Inc., Alfonso Hernandez Torres and Ramonita Ortiz Vazquez, and Alfonso A. Hernandez Ortiz, Plaintiffs,

v.

### Robert Hatton Gotay and Maria de los Angeles Rentas, Debtors.

Bankruptcy Nos. 96–06038, 97–14399, 97–14400.

Adversary No. 01–0073.

United States Bankruptcy Court, D. Puerto Rico.

July 12, 2006.

---

**490**

Jose Raul Cancio Bigas, Hato Rey, PR, Rafael Elvira Caballero, Rafael Elvira Cabalero Law Office, Ponce, PR, for Empresas Inabon, Inc.

Mary Ann Gandia Fabian, San Juan, PR, for Alfonso Hernandez Torres and Ramonita Ortiz Vazquez.

Maria Luisa Contreras, Maria Soledad Pineiro, San Juan, PR, for Alfonso A. Hernandez Ortiz.

## OPINION AND ORDER

ENRIQUE S. LAMOUTTE, Bankruptcy Judge.

This case came before the court for trial on January 10, 11 and 12, 2005, and February 9 and 10, 2005. At issue is the validity and allowed amount of the proofs of claim filed by defendants Robert Hatton Gotay and Maria de los Angeles Rentas ("the Hattons") in the debtors' bankruptcy cases, which are based upon a series of financial transactions entered into between the parties. The debtors argue that they are jointly liable to pay the Hattons only $3,021,145.00, which includes principal and interest at the rate of 16.75% per annum. The Hattons argue that they should receive the entire amount claimed in their proofs of claim, including interest, fees and charges which, according to their expert, amounted to $12.7 million dollars as of June, 2002.

Having considered the stipulated facts, the testimonial and documentary evidence presented at trial, and the post-trial memoranda of law, the court concludes that as of the filing of its bankruptcy petition on August 6, 1996, Empresas Inabón was indebted to the Hattons, jointly with Hernández Torres and Hernández Ortiz, in the amount of $4,523,894.59 [1]. Further, as of the filing of their bankruptcy petitions on December 5, 1997, the amount to which Hernández Torres and Hernández Ortiz were indebted to the Hattons had increased to $7,856,780.65 [2]. However, the court has not been placed in a position to determine with certainty to what extent the claims are secured as to each debtor, and upon what basis they are secured, because it does not know the value of the properties securing the debts. Notwithstanding, the court is able to determine that the Hattons' claims are not oversecured, a fact assumed by all parties at trial; therefore, they are not entitled to

---

**1.** This is approximately the amount of the secured claim filed by the Hattons in Inabón's bankruptcy petition, claim no. 119, and is based upon the amounts agreed upon by the parties as to each of the four debts in the "Stipulation" (Exhibit PP) as of June 18, 1996, plus interest calculated on those amounts as of August 6, 1996, the date of the filing of Inabón's bankruptcy petition. The proof of claim contains a mathematical error; although it shows a total of $4,523,894.76, the actual total of the four principal amounts, plus interest as of the petition date, totals $4,523,894.59.

**2.** This is the amount of the claim filed by the Hattons in the Hernández Torres case (unsecured) and the Hernández Ortiz case (secured) on March 2, 1998 (claims no. 10 and 13, respectively), and is based upon the amounts agreed upon by the parties as to each of the five debts in the Renewal Agreement (Exhibit XII) as of May 15, 1997, plus interest calculated on those amounts as of December 5, 1997, the approximate date of the filing of the Hernández Torres and Hernández Ortiz bankruptcy petitions.

post-petition interest, fees and costs on their claims.

## Background

Debtors filed the complaint commencing this adversary proceeding on August 16, 2001, for a determination of the validity, priority or extent of lien or other interest in property. Debtors also objected to the claims filed by the Hattons in their bankruptcy proceedings. The first cause of action seeks to have the Hattons' claims denied in their entirety and that the court rescind the four financial agreements entered into between the parties because they are unenforceable and against public policy due to the Hatton's unconscionable negotiation tactics. The second cause of action seeks to have the agreements declared void and unenforceable pursuant to 31 L.P.R.A. § 3404 and § 3406 because the debtors were intimidated into entering into them. The third cause of action seeks to have the Hattons' proofs of claim denied in their entirety and the loan agreements declared void and unenforceable because they violate Regulation 26–A, which regulates maximum interest rates and finance charges. The fourth cause of action asks that the proofs of claim be denied because of the Hattons' breach of their fiduciary duty to debtors, which arose from their close business relationship and from debtors' confidence and trust in the Hattons and SOMO. The fifth cause of action alleges fraud based upon the Hattons intentional and willful misrepresentation of facts and concealment of material information to induce the debtors into executing the ruinous financial agreements. The sixth cause of action alleges that the Hattons and SOMO converted some of the proceeds of the loan agreements. The seventh cause of action alleges the Hatton's proof of

claim is invalid under 11 U.S.C. § 502(b)(4) because it improperly includes penalties for "defaulting" on the Management Agreement, and Hatton's claim should be limited to the value of the services he rendered to Inabón. The eighth cause of action alleges that the proof of claims are invalid under 11 U.S.C. § 506(b) because it includes unreasonable interest, fees and charges. The ninth cause of action alleges breach of contract with regard to a mortgage note, executed on November 15, 1995 in the amount of $1,000,000.00 at 8.75% interest, and pledged to Shell Company PR, Ltd. on February 19, 1997, to guarantee a debt, the collateral for which was a 46 *cuerdas* property belonging to Hernández Ortíz.

The Hattons answered the complaint on October 15, 2001. They argue, among other affirmative defenses, that the debtors' claims are barred by the doctrines *res judicata* and collateral estoppel in that they have already been adjudicated by another court, and that the parties have already reached a settlement agreement which encompasses the issues raised in the complaint.

After a series of status and pre-trial conferences, trial was scheduled for January, 2005. The defendants filed proposed findings of fact on January 7, 2005 (dkt.# 64), and the debtors filed proposed findings of fact and conclusions of law on January 10, 2005 (dkt.# 65). After the trial, the parties filed post-trial memoranda, including proposed findings of fact and conclusions of law, on July 26, 2005 (dkts. # 91 and 92).

## Stipulated Findings of Fact [3]

1. On December 7, 1995, a Loan Agreement was signed by ALRA Con-

---

**3.** The stipulations were submitted in court on January 11, 2005; see minutes of proceed-

ings, dkt. no. 68 in adversary proceeding no. 01–0073. The stipulations are transcribed

struction Corp. (hereinafter "ALRA") and Southern Mortgage Corporation ("SOMO") for the sum of $603,348.00 [4] [hereinafter referred to as "the first loan"] (Joint Exhibit V).

2. From the aforementioned amount, ALRA received the sum of $474,360.11. The balance of the loan was retained by SOMO for the following:

 (a) $24,439.89 for embargo/property insurance

 (b) $1,200.00 for manager's insurance fee

 (c) $103,348.00 for SOMO

(Defendants' Exhibit C).

3. The Promissory Note evidencing this transaction is Exhibit B and the Loan Agreement is Joint Exhibit V.

4. On January 2, 1996, a Loan Agreement was signed by Empresas Inabón (hereinafter "Inabón") and SOMO for the sum of $2,475,000.00 [hereinafter referred to as "the second loan"] (Joint Exhibit VII).

5. From the aforementioned amount, Inabon received the sum of $1,621,966.00 through a check marked as Joint Exhibit IV. The balance of the loan was retained by SOMO for the following:

 (a) $ 83,500.00 for federal embargo

 (b) $ 1,000.00 for the cost of cancelling the embargo

 (c) $ 45,000.00 for legal expenses

 (d) $ 99,000.00 for origination

 (e) $200,000.99 for Alliance Capital

 (f) $ 46,000.00 for penalty for sale margination

for a total of $475,000.00. (Defendants' Exhibit G).

6. From the proceeds of the loan, $350,000.00 was discounted by SOMO to pay that sum to Citibank for the benefit of Inabón to pay off the Mortgage Loan that encumbered the property that secured the transactions. See Exhibit F2 (check) and Exhibit FF (Citibank Mortgage Note in the principal amount of $315,000.00 with an interest rate of $15%$ issued on July 16, 1992).

7. The Exhibits related to this transaction are Exhibits G to Q.

8. The Promissory Note evidencing this transaction is Exhibit H and the Loan Agreement is Joint Exhibit VII.

9. The Mortgage Note (Exhibit FF) was delivered by Citibank to SOMO who kept it as additional collateral. Robert Hatton ("Hatton") currently holds this note. See Exhibit M (Pledge Agreement dated January 2, 1996, between SOMO and Inabón).

10. Joint Exhibit IV (check in the amount of $1,621,966.80) was issued to the order of SOMO who endorsed the check to Inabón.

11. In addition, the amount of $28,034.99, divided into three checks of $9,344.42 each, was retained by SOMO; that sum was reduced and discounted from the loan.

12. On January 24, 1996, Inabón and Hatton executed an Executive Management Services Agreement (Joint Exhibit VIII). This Agreement was guaranteed by Alfonso Hernández Torres ("AHT") and Alfonso Hernández Ortíz ("AHO").

13. On January 24, 1996, SOMO, Inabón, AHT and AHO executed a Financial Agreement (Joint Exhibit IX).

14. The Executive Management Agreement was cancelled by Inabón through its President.

15. On February 5, 1996, Empresas Inabón, AHT and AHO filed a complaint against Hatton in the Puerto Rico Court of

---

herein, with discrepancies footnoted and comments by the court in brackets.

**4.** The stipulations incorrectly state the amount as $603,603,348.00.

General Jurisdiction, Ponce Part, case no. JEP 96–0011 (Exhibit DD).

16. On February 16, 1996, Hatton filed two (2) complaints against Empresas Inabón, AHT, AHO, and ALRA in the Puerto Rico Court of General Jurisdiction, Ponce Part (Exhibits HH, II) [5].

17. Hatton answered the complaint no. JEP 96–0011 on March 21, 1996, and also filed a counterclaim (Exhibit KK).

18. On June 2, 1996, AHT, AHO, Inabón, ALRA and Hatton and his wife executed a handwritten document entitled "Acuerdo" [hereinafter referred to as the "Acuerdo"]. The parties acknowledge that Hatton credited the $24,439.89 that had been retained until the embargo was paid in full. Said amount was credited and reduced from the $603,348.00 principal of the first loan, reducing the principal of the first loan to $578,908.11. The parties further agreed that ALRA, AHT and AHO were to pay Hatton the following amounts of money for the principal, accrued interest and penalties regarding the first loan:

| | |
|---|---|
| (a) Principal | $578,908.11 |
| (b) Interest until June 7, 1996 | $ 30,541.20 |
| (c) 10% legal fees | $ 57,800.00 |
| (d) 5% breach penalty | $ 28,943.00 [6] |
| (e) 20% penalty | $115,781.62 |
| (f) Creditor's Fees | $ 18,000.00 |
| (g) Creditor's Expenses | $ 4,675.00 |
| (h) Attorney's Fees until final resolution | $ 10,000.00 |
| (i) Penalty for the late payment on interest | $ 1,126.82 |

For a total amount of $845,777.74. (Exhibit OO).

19. The aforementioned agreement also provided that the $2,475,000.00 second loan was reduced to $2,391,500.00 and Inabón, AHT, and AHO agreed to pay the following amounts of money for the principal, accrued interest, penalties and late charges and creditors' fee:

| | |
|---|---|
| (a) Principal | $2,391,500.00 |
| (b) Interest to June, 1996 | $ 141,314.17 |
| (c) 10% Legal Fees | $ 239,150.00 |
| (d) 5% Late Penalty of Monthly Interest Penalty | $ 5,090.65 |
| (e) 20% Penalty | $ 115,781.62 [7] |
| (f) Creditor's Expenses | $ 10,000.00 |
| (g) Creditor's Attorneys Fees | $ 13,350.00 |

For a total of $2,800,409.70.[8] (Exhibit OO).

20. In addition, the parties agreed to pay Hatton $441,900.00 for the cancellation of the Executive Management Agreement (hereinafter referred to as "the management agreement debt") and $262,353.00 for the cancellation of the Financial Agreement (hereinafter referred to as "the financial agreement debt").

21. The parties agreed to a repayment schedule of the revised obligation of $4,500,440.40 [9].

22. On June 18, 1996, the parties entered into stipulations [hereinafter re-

---

5. Although both complaints are dated February 15, 1996, case no. JCD 96–0015(602) bears no date stamp indicating when it was filed, while case no. JCD 96–0016(603) bears a date stamp indicating that it was filed on February 16, 1996.

6. Although the parties stipulated this amount, the "Acuerdo" (Exhibit OO) indicates the amount was $28,945.00.

7. Although the parties stipulated as to this amount, it was not included in the "Acuerdo" (Exhibit OO) and is obviously not included in the total.

8. Although the parties stipulated as to this amount, and it is the amount included as the total in the "Acuerdo", by the courts calculation the actual amount is $2,800,404.70.

9. Although the parties stipulated as to this amount, it is not clear to the court from where this amount comes, as the total of the amounts owed for the first loan (paragraph 18), the second loan (paragraph 19), the management agreement debt and the financial agreement debt (paragraph 20) actually total $4,350,440.44. Although the amount of $4,500,440.40 (as stipulated) is included on the last page of the "Acuerdo" as the "total revised obligation", there are additional calculations on that page (which are only partially legible), indicating a final balance owed of $595,440.40. There is no indication of a repayment schedule in said "Acuerdo".

ferred to as the "Stipulation"], represented by their respective legal counsels, in all of the cases pending in the Superior Court, Ponce Part. Through said stipulations, the charges and principal related to loan #1 [the first loan] were increased to $846,903.00 and the ones related to loan #2 [the second loan] were increased to $2,859,443.00. (Exhibit PP).

23. All of the aforementioned principals, interest, and other charges were consolidated, capitalized and converted into the following promissory notes:

(a) $2,859,443.00 [regarding the second loan] to the order of Hatton, to become due December 18, 1996, with interest to accrue at 18.75% per annum (Exhibit QQ).

(b) $449,261.50 [regarding the management agreement debt] to the order of Hatton, to become due on December 18, 1996, with interest to accrue at the rate of 18.75% per annum (Exhibit RR).

(c) $262,353.00 [regarding the financial agreement debt] to the order of Hatton to become due on December 18, 1996, with interest to accrue at the rate of 18.75% per annum (Exhibit SS).

(d) $98,706.50 [regarding the first loan] to the order of Hatton to become due on December 18, 1996, with interest to accrue at the rate of 18.75% per annum (Exhibit TT) [10].

24. The stipulations further provided that if the original term of the notes (December 18, 1996) expired, and they had not been paid, Hatton could renew the obligations ("first renovation") at the request of any of the Debtors and that Hatton, at his option, could automatically renew said notes. All renovations granted by Hatton would increase the obligations by 10%, including principal, interest, late charges and other penalties like $12,000.00 for courier attorney fees, as well as creditor's fees at the rate of $250.00 per hour.

25. On August 6, 1996, Inabón filed for reorganization before this court.

26. A partial judgment approving the stipulations entered in the cases that were filed in the Superior Court of Ponce was entered on August 7, 1996, and notified to the parties on August 9, 1996 (Exhibit X).

27. One month after the filing of Inabón's petition, on September 7, 1996, AHT and AHO executed an agreement titled "Agreement regarding Stipulations of Judgment by Settlement" [11] (Exhibit XI) through which the various obligations executed on June 18, 1996 were further renewed and renegotiated as follows:

(a) The $449,261.50 note was increased to $556,419.29 [re: the management agreement debt].

(b) The note for $2,859,443.00 was increased to $3,305,429.61 [re: the second loan].

(c) The note for $846,903.00 was increased to $1,009,962.25 [re: the first loan].

---

**10.** Although it is not clear in the stipulated findings of fact, as is subsequently detailed in paragraph 108 of this opinion, in the findings of fact based upon the proceedings at trial, this amount is based upon the assignment of $750,000.00, by the debtors to Hatton, from the sale of a parcel of land to the Puerto Rico Highway and Transportation Authority. When said amount is subtracted from the $846,903.00 owed on the first loan, a balance of $98,706.50 remains. However, apparently that amount was not paid to Hatton, as the subsequent financial agreements reflect the balance owed returning to its original amount—plus, of course, interest, fees and charges.

**11.** "Acuerdo en Relación a Estipulación de Sentencia por Transacción", hereinafter referred to as the "Stipulation Agreement".

(d) The note for $262,353.00 was increased to $343,235.13 [re: the financial agreement debt].

for a total of $5,215,046.28 [12].

28. All amounts mentioned in the preceding determination were capitalized and included in four (4) promissory notes [13] that were issued by AHT and AHO on that same date, which would accrue interest at the rate of 18.75% per annum until their due date on June 18, 1997, and could be renewed under the same conditions established for renovation in the Stipulations.

29. On May 15, 1997, AHT, AHO and Hatton executed an agreement entitled "Agreement for the Renewal of Obligations" [14] (Joint Exhibit XII), whereby the parties agreed to renew all the obligations issued in favor of Hatton on September 7, 1996, through which said obligations were further renewed and renegotiated as follows:

(a) The $556,419.29 note was increased to $751,121.96 (Exhibit EEE) [re: the management agreement debt].

(b) The $3,818,804.10 note was increased to $4,244,684.50 (Exhibit FFF) [15].

(c) The $1,009,962.25 note was increased to $1,327,504.00 (Exhibit GGG) [re: the first loan].

(d) The $343,235.13 note was increased to $504,052.98 (Exhibit HHH) [re: the financial agreement debt].

30. In addition, through the Agreement described in the preceding paragraph, AHT and AHO agreed to pay Hatton $117,044.45 for additional creditors attorney's fees expended in the Inabón bankruptcy; $247,353.00 for "previous financing agreement" and $3,579.00 for other fees related to the execution of legal documents, for a total of $367,976.45 [16]. (Exhibit III).

31. AHT and AHO filed their respective Chapter 11 petitions on December 5, 1997.

32. On November 13, 1996, Hatton filed a proof of claim in the Inabón case for $4,845,644.76.

33. On March 9, 1998, Hatton filed a proof of claim in each of AHT and AHO cases for $7,856,780.65 plus interest at 18.75%.

### Findings of Fact—Trial on the Merits

34. Debtor Empresas Inabón, Inc. ("Inabón") is a domestic corporation organized and operating under the laws of the Commonwealth of Puerto Rico with principal offices located in the city of Ponce, Puerto Rico. (Complaint ¶ 4).

35. The majority and controlling shareholders of Inabón during the occurrence of all relevant facts are debtors Alfonso Hernández Torres (Hernández Torres), his spouse, Ramonita Ortiz a.k.a. "Monin" (Mrs. Ortiz) and their only son, Dr. Alfonso Hernández Ortiz a.k.a. "Alfonsito" (Dr. Hernández).

36. Hernández Torres is a developer of residential, commercial and industrial

---

**12.** The individual debtors also agreed to pay the Hattons $18,000.00 in fees and costs in the stipulation agreement.

**13.** However, said promissory notes were not submitted into evidence at the trial.

**14.** "Acuerdo Sobre Renovacion de Obligaciones", hereinafter referred to as the "Renewal Agreement".

**15.** The court assumes this relates to the second loan but is not clear where the amount of $3,818,804.10 comes from since, according to stipulated finding of fact no. 27(b), the amount of the note pertaining to that debt was $3,305,429.61.

**16.** An additional promissory note was executed in this amount.

properties, a general contractor and an industrialist, who has been in business for over fifty (50) years. He has developed approximately 12,000 units including one project of 5,000 units, Urb. Punto Oro. He has had commercial financing experience since 1956, his highest commercial financing being in the range of $500,000,000.00.

37. Dr. Hernández is a psychiatrist with a private practice in the city of Ponce, Puerto Rico.

38. Mrs. Ortiz was a housewife, although a teacher by trade, and in addition to being a shareholder and director of Inabón, acted as the secretary of said corporation.

39. Hernández Torres, Mrs. Ortiz and Dr. Hernández have also been members of the board of directors and officers of Inabón.

40. Hernández Torres, Mrs. Ortiz and Dr. Hernández are also the sole shareholders of a domestic corporation named ALRA Construction Corporation (ALRA), dedicated to the business of construction and development.

41. Towards the end of the year 1995, Inabón was undergoing substantial financial difficulties and was in need of working capital. Exhibit D; trial transcript 1/10/05, dkt. no. 75 at p. 8.

42. Mr. Hernández Torres, President of Inabón, was referred to Mr. Robert Hatton Gotay ("Hatton") as a person who could provide the financing needed by Inabón.

43. Southern Mortgage Corporation ("SOMO") is a domestic corporation dedicated to the business of mortgage financing for over thirty (30) years with main offices in the City of Ponce, Puerto Rico. Mr. Hernández Torres was a shareholder of SOMO in its origins.

44. Hatton has never been a shareholder, director, officer or employee of SOMO.

45. The president of SOMO is Mr. Jorge Rivera, who was the person who signed in representation of SOMO all documents executed by SOMO in relation to the matters of this adversary proceeding. See trial transcript 1/10/05, dkt. no. 75 at pp. 27–28.

46. Mr. Rivera has been a friend of Mr. Hernández Torres for approximately twenty (20) years.

47. In late 1995, Inabón approached SOMO for a loan to assist it in paying its payroll and emergency expenses. Complaint ¶ 8.

48. Attorney Rafael Elvira, a friend, accompanied Mr. Hernández Torres to meet with Mr. Rivera for the loan.

49. Product of negotiations, in December, 1995, and January, 1996, SOMO granted two commercial loans to Inabón and ALRA. Exhibits C and G; trial transcript 1/10/05, dkt. no. 75 at pp. 11, 22, 32, 33.

50. On December 7, 1995, SOMO granted ALRA a loan for the amount of $603,348.00. Complaint ¶ 9; Exhibit C; Joint Exhibit V; written stipulation no. 1.

51. On that same date, Hernández Torres, as president of ALRA, signed a promissory note for the aforementioned principal amount of $603,348.00. Exhibit B, written stipulation no. 3.

52. SOMO and ALRA also executed a document entitled "Contrato de Préstamo, Prenda y de Cesión de Cuenta por Cobrar". Hernández Torres appeared in the said document as president of ALRA, and also with Mrs. Ortiz, both as personal guarantors of ALRA's obligations. Joint Exhibit V; written stipulation no. 3.

53. On that same date, ALRA, represented by its president, Hernández Torres,

subscribed with the Puerto Rico Highway and Transportation Department (PRHTD) an agreement entitled "Contrato de Cesión de una Porción del Precio de Compraventa". Exhibit A.

54. In the "Contrato de Cesión de una Porción del Precio de Compraventa", ALRA authorized PRHTD to pay SOMO directly the amount of $603,348.00, to be deducted from the proceeds of the purchase price of a parcel of land property of ALRA, said amount to be applied to the repayment of the loan granted by SOMO to ALRA. Exhibit A.

55. Shortly after the said loan was granted, SOMO assigned the agreement referred to in the previous two paragraphs to Hatton. Complaint, ¶ 9.

56. On January 2, 1996, SOMO granted Inabón a second loan for the amount of $2,475,000.00. Exhibit G; Joint Exhibit VII; see also, Complaint ¶ 11 and 12; written stipulation no. 4; trial transcript 1/10/05, dkt. no. 75 at pp. 32–33.

57. On that same date, Hernández Torres, as president of Inabón, signed a promissory note for the principal amount of $2,475,000.00. Defendant's Exhibit I; written stipulation no. 7.

58. Hernández Torres, his spouse, Mrs. Ortiz, and Dr. Hernández are guarantors on both loans. Exhibit J; Exhibit K; and Exhibit L; written stipulation no. 7.

59. On that same date of January 2, 1996, Inabón as well as Hernández Torres, Mrs. Ortiz and Dr. Hernández signed several promissory notes and the respective mortgage deeds in order to execute liens over real property owned by them, guaranteeing the repayment of Inabón's debt towards SOMO. Exhibit M, Exhibit N, Exhibit O, and Exhibit P; written stipulation no. 7.

60. Also on January 2, 1996, Inabón, represented by its president, Hernández

Torres, and Dr. Hernández, signed with Westernbank Puerto Rico and SOMO an agreement to limit the mortgage credit and for secondary pledge of the mortgage note for $1,500,000.00 held by Westernbank. Exhibit Q; written stipulation no. 7.

61. Subsequently, as previously agreed, these loans were purchased from SOMO by Hatton who thus became debtors' creditor by assignment. Exhibits F1, F2, F3 and F4.

62. Although Inabón received the above-described amount, it still needed funds and was for such purpose negotiating with SOMO another loan for the amount of $4,000,000.00. Exhibit R, Exhibit S.

63. SOMO expressed its willingness to agree to such loan if Hatton, or any other investor, would previously agree to the loan (the credit) after disbursement. Trial transcript 1/12/05, dkt. no. 72 at p. 51.

64. Since this was an essential condition for SOMO, Inabón and Hatton entered into negotiations for the purchase of the said loan. Trial transcript 1/12/05, dkt. no. 72, p. 5.

65. Hatton informed Inabón's shareholders that he would purchase the loan if Inabón's management were substituted in order to diminish the risk on recovering the sums to be invested. Trial transcript 1/12/05, dkt. no. 72 at pp. 52 and 53.

66. Hernández Torres and Hatton agreed that in order to insure proper management of Inabón's affairs, and the credits he was holding and was about to purchase, that Hatton directly undertake the full management of Inabón as executive director of the corporation. Joint Exhibit VIII; trial transcript 1/12/05, dkt. no. 72 at pp. 52 and 53.

67. Engineer Miguel Cordero Santiago (Eng.Cordero), Inabón's chief of opera-

tions, was appointed by Hernández Torres to participate in the drafting of a Management Agreement. Trial transcript 1/12/05, dkt. no. 72 at pp. 54 and 55.

68. After negotiations involving the review and discussion of several drafts of the final document that was signed, Inabón and Hatton reached an agreement entitled "Executive Management Agreement". Trial transcript 1/12/05, dkt. no. 72 at pp. 54–56.

69. On January 20, 1996, Hernández Torres and his spouse, Mrs. Ortiz, suffered a car accident which resulted in injuries that required their hospitalization on an emergency basis at the Caguas Regional Hospital. He was then transferred to the Ponce Regional Hospital, wherein Hernández Torres underwent surgery. On January 23, 1996, he had an ear reconstructed by a plastic surgeon. Hernández Torres was discharged on January 24, 1996.

70. During most of the negotiations with Hatton, Hernández Torres and Dr. Hernández were being advised by their legal counsel, financial advisors and the corporation's executives, both before, during and after the referred car accident, all of whom participated in the negotiations at one time or another. Trial transcript 1/12/05, dkt. no. 72 at pp 55–56; trial testimony 1/10/05, dkt. no. 75 at pp. 27–28 and 90–92.

71. On January 24, 1996, Inabón, Hernández Torres and Dr. Hernández signed with SOMO a document entitled "Financial Agreement". Joint Exhibit IX; written stipulation no. 13; trial transcript 1/11/05, dkt. no. 76 at pp. 19–21.

72. Hernández Torres appeared on said Financial Agreement as president of Inabón and in his personal capacity, along with Dr. Hernández, both as personal guarantors. Joint Exhibit IX; written

stipulation no. 13; trial transcript 1/11/05, dkt. no. 76, p. 19.

73. On said Financial Agreement, SOMO agreed to grant a loan to Inabón in the amount of $4,000,000.00. Joint Exhibit IX.

74. Inabón and its guarantors represented to SOMO that they had agreed to change the management of Inabón and to retain the services of a professional executive manager. Joint Exhibit IX; trial transcript 1/12/05, dkt. no. 72, p. 61.

75. On the same date of January 24, 1996, Hatton, Inabón, Hernández Torres and Dr. Hernández signed the Management Agreement. Joint Exhibit VIII; stipulation no. 12; trial transcript 1/12/05, dkt. no. 72 at p. 61.

76. Dr. Hernández signed the Management Agreement in his personal capacity and this time as president of Inabón. Joint Exhibit VIII; written stipulation no. 12.

77. Aside from the Hernández Torres, Dr. Hernández and Hatton's signatures, said Management Agreement was also signed by Eng. Cordero as witness. Joint Exhibit VIII; stipulation no. 12; trial transcript 1/11/05, dkt. no. 76 at pp. 19, 23.

78. Mrs. Ortiz, whose name appeared in the document as guarantor of Inabón's obligations, did not sign the Management Agreement. Joint Exhibit VIII.

79. Hatton consented to not having to have Mrs. Ortiz sign the Management Agreement on that same date.

80. Inabón agreed to pay Hatton for professional services $300,000 annually, payable in twelve equal monthly installments of $25,000.00 each, plus additional benefits and bonuses, as described in the agreement, such as the right to purchase up to 25% of all of Inabón's outstanding

stock, at a set price of one cent per share. Joint Exhibit VIII,

81. Inabón's board of directors' certificate of corporate resolution authorizing the Management Agreement and the Financial Agreement was prepared and signed by Hernández Torres as sub-secretary of Inabón. Exhibit U.

82. On the aforesaid certificate, Hernández Torres asserts that Inabón's board of directors had met and approved a corporate resolution ratifying the aforementioned Management Agreement and the Financial Agreement. Exhibit U.

83. As agreed, on the morning of Friday, January 26, 1996, Eng. Cordero Santiago picked Hatton up at his home and drove him to Inabón's main offices and during all such day Hatton proceeded to undertake his responsibilities in accordance with the terms of the Management Agreement. Trial transcript 2/12/05, dkt. no. 72 at pp. 62 and 63; Complaint ¶ 76.

84. Sometime after 5:00 p.m., Hernández Torres phoned Hatton at Inabón's main offices and told Hatton that he had decided to cancel the Management Agreement, as well as the other documents signed on January 24, 1996. Trial transcript 1/12/05, dkt. no. 72 at p. 63.

85. Hatton replied that such matter had to be discussed in person instead of over the phone and therefore they agreed to meet at Hernández Torres' home later that afternoon. Trial testimony 1/12/05, dkt. no. 72, p. 64.

86. That afternoon Hatton met with Hernández Torres; attorney Agustin Collazo Tirado, legal counselor for Inabón; and Eng. Cordero and, although Hatton provided Hernández Torres with a detailed account of all actions he had undertaken during the day for Inabón's benefit, Hernández Torres reaffirmed his intention of cancelling all agreements signed on January 24, 1996, wherefore Hatton requested from Hernández Torres a written notification of his decision to unilaterally terminate the Management Agreement and until such was received he would continue performing his obligations under the Management Agreement. Trial testimony 1/12/05, dkt. no. 72, p. 64; trial testimony 1/10/05, dkt. no. 75 at pp. 90–92.

87. On Monday, January 29, 1996, Hatton again went to work at Inabón's main offices and while there received a letter from Hernández Torres, reaffirming his decision to terminate the Management Agreement. Hernández Torres signed the letter as president of Inabón. Exhibit V; Complaint ¶ 76; trial transcript 1/12/05, dkt. no. 72 at p. 64.

88. After receipt of said letter from Hernández Torres, Hatton left the Inabón's premises against his will.

89. The next day, on January 30, 1996, Hatton replied to Hernández Torres' written notice of termination by letter to Dr. Hernández as president of Inabón, stating his objection to the unilateral early termination of the Management Agreement and attached a memorandum dated January 26, 1996, in which he had exercised his right to purchase 25% of all Inabón's outstanding stock and included payment for such stock. Exhibit CC; Exhibit W; Exhibit X; Exhibit Y; Exhibit Z; Exhibit AA; Exhibit BB; trial transcript 1/12/05, dkt. no. 72, pp. 67–69.

90. Hernández Torres' decision regarding the early termination of the Management Agreement notified to Hatton by phone, in person, and in writing, was done in his personal capacity and in representation of Inabón, in complete agreement and with the consent of Dr. Hernández. Trial transcript 1/12/05, dkt. no. 72, pp. 65–66.

91. Hernández Torres did not call for a board of director's meeting prior to mak-

ing and notifying Hatton of his decision to terminate the Management Agreement.

92. The Management Agreement provides that if Inabón were to terminate the agreement early, Inabón would pay Hatton a compensation of $5,000,000.00. Joint Exhibit VIII.

93. All parties, that is, Hatton, Hernández Torres and Dr. Hernández possess the experience and complete understanding of the consequences of a breach of an agreement such as the Management Agreement.

94. The Management Agreement was for twelve years, and provided that said term was binding on Inabón but could be cancelled by Hatton with sixty days notice. It further provided that in the event of early termination of the agreement by Inabón, Hatton would be entitled to remain in his position, with all its rights and privileges, including his regular annual compensation of $300,000.00, until the payment of his $5,000,000.00 termination compensation. Joint Exhibit VIII.

95. In addition to the benefits described in the previous two paragraphs, Hatton also had the right to request that Inabón and the appearing guarantors in the Management Agreement pay or refund all costs and attorney's fees resulting from any case related to such Management Agreement, as provided by its section H, paragraph 3. Joint Exhibit VIII.

96. Likewise, pursuant to the Management Agreement, Hatton was entitled to acquire stock from Empresas Inabón, Inc., which right Hatton timely exercised giving prior notice and forwarding the stock certificates that should have been issued on his behalf, for the signature of the corporate officials, with a cashier's check for payment of the stock, as contractually agreed to by the parties. Joint Exhibit VIII; Exhibit X.

97. On February 5, 1996, Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández filed a civil action related to the management agreement against Hatton and his wife, María de los Angeles Rentas Costas, before the Court of First Instance of the Commonwealth of Puerto Rico, Ponce Section, Civil No. JPE96–001, entitled *Empresas Inabón, Inc. et al. v. Robert Hatton Gotay et al.* Exhibit DD.

98. On February 15, 1996 [17], Hatton and his wife, María de los Angeles Rentas Costas, filed a complaint for collection of monies related to the second loan against Inabón, Hernández Torres, Mrs. Ortiz Torres and Dr. Hernández, before the Court of First Instance of the Commonwealth of Puerto Rico, Ponce Section, Civil No. JCD96–0015, entitled *Robert Hatton Gotay et al. v. Empresas Inabón, Inc. et al.*. Exhibit HH; Complaint; written stipulation no. 16.

99. On February 16, 1996, Hatton and María de los Angeles Rentas Costas filed a complaint for collection of monies related to the first loan against ALRA Construction Corporation, Hernández Torres, Ramonita Ortiz Torres and Dr. Alfonso Hernández Ortiz, before the Court of First Instance of the Commonwealth of Puerto Rico, Civil No. JCD96–0016, entitled *Robert Hatton Gotay et al. v. ALRA Construction Corporation et al.* Exhibit II; Complaint; written stipulation no. 16.

100. On March 21, 1996, Hatton and María de los Angeles Rentas Costas filed their answer to the complaint and a counterclaim, seeking to collect damages related to the cancellation of the management agreement, in *Empresas Inabón, Inc. et al. v. Robert Hatton Gotay et al,* Exhibit KK; written stipulation no. 17.

**17.** See footnote 4, above.

101. Pursuant to negotiations that had been undertaken for the settlement of all the suits among the parties, on May 31, 1996, Hatton addressed a communication to Dr. Hernández and Hernández Torres stating his willingness to waive his right to purchase Inabón's outstanding stock in order to settle all their respective judiciary claims. Exhibit NN.

102. On June 2, 1996, Hernández Torres, Mrs. Ortiz Torres, Dr. Hernández, Inabón, ALRA, Hatton and his spouse, María de los Angeles Rentas Costas, entered into a handwritten settlement agreement, simply entitled "Acuerdo". Exhibit OO; written stipulation no. 18.

103. In said "Acuerdo", the parties agreed that Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández would waive any and all judicial claims made against Hatton and his wife and request from the court that civil case JPE96–0011, *Empresas Inabón, Inc. et al. v. Robert Hatton et al.* be dismissed with prejudice. Exhibit OO.

104. In said "Acuerdo", the parties also agreed that Inabón, Hernández Torres, Mrs. Ortiz, Dr. Hernández and Hatton would waive all past, present and future claims against each other, as individuals and as corporate representatives (mutual waiver of claims), in accordance with the following:

i. ALRA, Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed and promised to pay Hatton all amounts claimed in civil actions # JCD96–0015 and # JCD96–0016, including all interest accrued until the total payment of said debts ($845,777.75 for one and $2,800,409.70 for the other one), as per exhibits A and B of the handwritten agreement.

ii. Inabón, Hernández Torres, Mrs. Ortiz, and Dr. Hernández agreed to pay Hatton the amount of $441,900.00 as compensation for the early cancellation of the Management Agreement, as well as the amount of $262,353.00 as penalty for having canceled a financial agreement.

iii. Hatton agreed to return to Inabón all of Inabón's stock he had acquired (25% of all outstanding stock) pursuant to the Management Agreement.

Exhibit OO; stipulation no. 20.

105. In order to formally execute the said Acuerdo, Hernández Torres, Mrs. Ortiz and Dr. Hernandez insisted that their legal counsel, the firm of Muñoz, Boneta, González Arbona Benítez & Peralta, write a final version of the settlement agreement (the "Stipulation"), which the parties later signed. Exhibit PP; written stipulation no. 22.

106. On June 18, 1996, Hatton, his spouse, Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández filed the settlement agreement in civil cases JEP96–0011, *Empresas Inabón Inc., et al. v. Robert Hatton Gotay;* JCD96–0016, *Robert Hatton Gotay v. ALRA Construction, et al.,* and JCD96–0015, *Robert Hatton Gotay v. Empresas Inabón, Inc. et al.* before the Court of First Instance of the Commonwealth of Puerto Rico, Ponce Section. Exhibit PP; written stipulation no. 22.

107. Paragraph one of the settlement agreement and the Ponce court's judgment provide as follows:

Inabón, Hernández Torres and Hernández Ortiz hereby state that the filing of their complaint [against Hatton] was due to a lack of communication, and therefore, they admit and accept that Hatton's allegations in his answer to the complaint and in his counterclaim are correct and are a truthful account of the

events that took place between the parties.

Exhibit PP at p. 3 ¶ 1.

108. In the Stipulation signed by the parties in order to execute said agreement, as approved by the Ponce Court, Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay Hatton the following sums, plus interest:

i. *$2,859,443.00*. This obligation relates to the second loan and is evidenced by a promissory note signed on June 18, 1996, by Hernández Torres, representing Inabón, to the order of Hatton and his wife for the amount of $2,859,443.00, due on December 18, 1996, plus annual interest at the rate of 18.75%, payable in advanced monthly payments beginning on July 18, 1996, as well as a 5% penalty if any payment is overdue for more than 10 days. On said promissory note, it was agreed to pay Hatton, or the note's holder, $285,944.30 for costs, expenses and attorney fees in the event that judicial claim needed to be made to collect the guaranteed amounts, and to pay $250.00 to Hatton or the holder, per hour spent on collection proceedings. A 20% penalty in the event that Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández filed a claim with respect to said debt, regardless of case outcome or results was also agreed to.

Exhibit QQ; written stipulation no. 23(a).

ii. *$441,900.00* [18]. This obligation relates to the management agreement debt and is evidenced by a promissory note signed on June 18, 1996, by Hernández Torres representing Inabón, to the order of Hatton and his wife for the amount of $449,261.50 (this amount includes $7,361.50 for documentary stamps and recording fees relative to the mortgage securing the same), due on December 18, 1996, plus annual interest at the rate of 18.75%, payable in advanced monthly payments beginning on July 18, 1996, and a 5% penalty if any payment is overdue for more than 10 days. On said promissory note, it was agreed to pay Hatton, or the note's holder, $44,926.50 for costs, expenses and attorney fees in the event that judicial claim needed to be made to collect the guaranteed amounts, and to pay $250.00 to Hatton or holder, per hour spent on collection proceedings. It was also agreed to pay a 20% penalty in the event that Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández filed a claim with respect to said debt, regardless of case outcome or results.

Exhibit RR; written stipulation no. 23(b).

iii. *$262,353.00*. This obligation relates to the financial agreement debt and is evidenced by a promissory note signed on June 18, 1996, by Hernández Torres representing Inabón, to the order of Hatton and his wife for the amount of $262,353.00, due on December 18, 1996, plus annual interest at the rate of 18.75%, payable in advanced monthly payments beginning on July 18,1996, and a 5% penalty if any payment is overdue for more than 10 days. On said promissory note, it was agreed to pay Hatton, or the note's holder, $26,235.30 for costs, expenses and attorney fees in the event that a judicial claim needed to be made to collect the guaranteed amounts, and to pay $250.00 to Hatton or holder, per hour spent on collection

---

18. Although in the "Stipulation" (Exhibit PP) the parties to agree to the amount of $441,900.00, the corresponding promissory note (Exhibit RR) is in the amount of $449,261.50. However, the mortgage note is in the amount of $441,900.00 (Exhibit YY), as is the mortgage deed which secures it (Exhibit ZZ).

proceedings. It was also agreed to pay a 20% penalty in the event that Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández filed a claim with respect to said debt, regardless of case outcome or results.

Exhibit SS; written stipulation no. 23(c).

iv. *$846,903.00* [19]. This obligation relates to the first loan and, from this amount, Debtors assigned $750,000.00 to Hatton from the proceeds of the sale of a parcel of land of 5.2054 "cuerdas" located at Canas Ward, PR–2, pending sale to the Puerto Rico Highway and Transportation Authority. The remaining debt of $98,706.50 (which includes the amount of $1,803.50 for stamps and recording fees relative to the mortgage securing the same) is evidenced by a promissory note signed on June 18, 1996, by Hernández Torres representing Inabón, to the order of Hatton and his wife for the amount of $98,706.50, due on December 18, 1996, plus annual interest at the rate of 18.75%, payable in advanced monthly payments beginning on July 18, 1996, and a 5% penalty if any payment is overdue for more than 10 days. On said promissory note, it was agreed to pay Hatton, or the note's holder, $9,870.65 for costs, expenses and attorney's fees in the event that a judicial claim needed to be made to collect the guaranteed amounts, and to pay $250.00 to Hatton or holder, per hour spent on collection proceedings. It was also agreed to pay a 20% penalty in the event that Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández filed a claim with respect to said debt, regardless of case outcome or results.

Exhibit TT; stipulation no. 23(d).

Thus, the total amount which Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay to the Hattons as of June 18, 1996, totaled $4,417,960.50.

109. On that same date, Dr. Hernández signed two mortgage notes, in his personal capacity, one for the principal amount of $100,000.00 and a second one for the principal amount of $520,000.00, both due on demand and payable to the bearer. Exhibit UU, Exhibit WW.

110. On the same date, two mortgage deeds, number 63 and number 64, were subscribed before notary public Alfonso J. Gómez Roubert by Dr. Hernández to respectively secure the repayment of the above-described obligations. Exhibit VV; Exhibit XX.

111. On that same date, Inabón, represented by its president, Hernández Torres, signed a promissory note for the principal amount of $441,900.00, due on demand and payable to the bearer. Subsequently, Inabón signed Mortgage Deed number 62 to secure the repayment of the obligation represented by said note. Exhibit YY; Exhibit ZZ.

112. On August 6, 1996, Inabón filed for bankruptcy under the provisions of Chapter 11 of the Bankruptcy Code. Written stipulation no. 25.

113. Dated August 7, 1996, and entered on August 9, 1996, the Superior Court of Puerto Rico, Ponce Section, entered Partial Judgment, approving the "Estipulación de Sentencia por Transacción" ("Stipulation") in civil cases no. JPE96–0011 (including Hatton's counterclaim), JCD96–0015, and JCD96–0016, and as agreed to by the parties, said judgment was to become final, firm and unappealable as of June 18, 1996. Joint Exhibit X.

---

**19.** Although in the "Stipulation" (Exhibit PP) the parties to agree to the amount of $846,903.00, the corresponding promissory note (Exhibit TT) is in the amount of $98,706.50. See footnote 8, above.

114. On September 7, 1996, Hernández Torres, Mrs. Ortiz and Dr. Hernández entered into and signed an agreement entitled "Acuerdo en Relación a Estipulación de Sentencia por Transacción" ("Stipulation Agreement") where the parties agreed to postpone payment of the amounts owed to Hatton and renewed the obligations under the "Stipulation" in order to grant time to reorganize Inabón. Joint Exhibit XI; written stipulation no. 27.

115. In consideration of the said extension of time, Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay Hatton the following amounts:

i. For the $449,261.50 (management agreement) debt:

| | | |
|---|---|---|
| a. | interest as of 9/6/96: | $ 18,231.62 |
| b. | costs | $ 12,000.00 |
| c. | courier charges | $ 12,000.00 |
| d. | attorney's fees | $ 10,000.00 |
| e. | creditor fees | $ 10,000.00 |
| f. | agreed charges (as per settlement agmt) | $ 44,926.17 |
| | TOTAL AMOUNT | $556,419.29 |

ii. For the $2,859.00 (second loan) debt:

| | | |
|---|---|---|
| a. | interest as of 9/6/96: | $ 116,042.31 |
| b. | costs | $ 12,000.00 |
| c. | courier charges | $ 12,000.00 |
| d. | attorney's fees | $ 10,000.00 |
| e. | creditor fees | $ 10,000.00 |
| f. | agreed charges (as per settlement agmt) | $ 285,944.30 |
| | TOTAL AMOUNT | $3,305,429.61 |

iii. For the $846,903.00 (first loan) debt:

| | | |
|---|---|---|
| a. | interest as of 9/7/96: | $ 34,368.95 |
| b. | costs | $ 12,000.00 |
| c. | courier charges | $ 12,000.00 |
| d. | attorney's fees | $ 10,000.00 |
| e. | creditor fees | $ 10,000.00 |
| f. | agreed charges (as per settlement agmt) | $ 84,690.30 |
| | TOTAL AMOUNT | $1,009,962.25 |

iv. For the $262,353.00 (financial agreement) debt:

| | | |
|---|---|---|
| a. | interest as of 9/6/96: | $ 10,646.83 |
| b. | costs | $ 12,000.00 |
| c. | courier charges | $ 12,000.00 |
| d. | attorney's fees | $ 10,000.00 |
| e. | creditor fees | $ 10,000.00 |
| f. | agreed charges (as per settlement agmt) | $ 26,235.30 |
| | TOTAL AMOUNT | $343,235.13 |

Joint Exhibit XI; written stipulation no. 27.

116. The parties agreed that the said renewed debts would be represented by promissory notes [20] in substitution of those previously identified as Exhibits QQ, RR, SS, and TT, which were executed on June 18, 1996. Written stipulation no. 28.

117. In the "Stipulation Agreement", Hernández Torres, Mrs. Ortiz and Dr. Hernández also agreed to pay Hatton the lump sum of $18,000.00 for costs and fees; and agreed that this amount was to be added to the principal and would accrue interest until its repayment. Joint Exhibit XI at p. 4.

118. Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay all costs and expenses incurred by Hatton in any attempt necessary to recover (judicial or extrajudicially) the principal or the interests, including travel, consulting, transportation, accommodations, office, mail and stamps, and meals. Joint Exhibit XI at pp. 5–6.

119. Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed in the "Stipulation Agreement" to pay for Hatton's own fees and attorney's fees, both at the rate of $250.00 per hour for all time spent in pursuing collection of any amount owed by the Hernández Torres, Mrs. Ortiz and Dr. Hernández, including all meetings with attorneys or advisors, court appearances, meetings with debtors or the advisors for the debtors. Joint Exhibit XI at pp. 5–6.

120. Also, in the "Stipulation Agreement", Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay Hatton all charges and fees related to these bankruptcy proceedings, being the fees set by the parties at the rate of $250.00 per hour

**20.** However, the "new" promissory notes are not part of the trial record.

for Hatton and his attorneys. Likewise, Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to this amount being added to the principal and to accrue interest at the rate of 18.75%. Joint Exhibit XI at p. 5–7.

121. The parties included a clause providing that all agreements in the "Stipulation Agreement" would remain binding, even if Hernández Torres, Mrs. Ortiz and Dr. Hernández were to file for bankruptcy. Joint Exhibit XI at p. 9.

122. Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to restructure the debt, and to pay the fees and charges described in the "Stipulation Agreement".

123. On May 15, 1997, Hernández Torres, Mrs. Ortiz and Dr. Hernández and Hatton executed yet another agreement, entitled "Acuerdo Sobre Renovación de Obligaciones" ("the Renewal Agreement"). Joint Exhibit XII; written stipulation no. 29.

124. As stated in the "Renewal Agreement", it was executed as per a written request from Hernández Torres, Mrs. Ortiz and Dr. Hernández to Hatton. Exhibit DDD.

125. In consideration of the said extension of time, Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay Hatton additional amounts for costs, creditor's fees, attorney's fees, courier charges, and stipulated charges. Joint Exhibit XII.

126. As per the terms of the "Renewal Agreement" and in consideration for such extension of time, Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay Hatton the following amounts:

i. For the $556,419.29 (management agreement) debt:

| | | |
|---|---|---|
| a. | interests from 9/7/96 as of 6/18/97 | $ 82,303.68 |
| b. | default penalty of 5% | $ 4,115.18 |
| | SUBTOTAL | $642,383.15 |
| c. | renewal charges of 10% | $ 64,283.81 |
| d. | costs | $ 12,000.00 |
| e. | courier charges | $ 12,000.00 |
| f. | attorney's fees | $ 10,000.00 |
| g. | creditor fees | $ 10,000.00 |
| | TOTAL AMOUNT | $751,121.96 |

ii. For the $3,305,429.00 (second loan) debt:

| | | |
|---|---|---|
| a. | interest from 9/7/96 as of 6/18/97 | $ 488,928.12 |
| b. | default penalty of 5% | $ 24,226.40 |
| | SUBTOTAL | $3,818,804.10 |
| c. | renewal charges of 10% | $ 381,880.41 |
| d. | costs | $ 12,000.00 |
| e. | courier charges | $ 12,000.00 |
| f. | attorney's fees | $ 10,000.00 |
| g. | creditor fees | $ 10,000.00 |
| | TOTAL AMOUNT | $4,244,684.50 |

iii. For the $1,009,962.25 (first loan) debt:

| | | |
|---|---|---|
| a. | interest from 9/7/96 as of 6/18/97 | $ 149,390.23 |
| b. | default penalty of 5% | $ 7,469.51 |
| | SUBTOTAL | $1,166.821.90 |
| c. | renewal charges of 10% | $ 116,682.19 |
| d. | costs | $ 12,000.00 |
| e. | courier charges | $ 12,000.00 |
| f. | attorney's fees | $ 10,000.00 |
| g. | creditor fees | $ 10,000.00 |
| | TOTAL AMOUNT | $1,327,504.00 |

iv. For the $343,235.13 (financial agreement) debt:

| | | |
|---|---|---|
| a. | agreed atty. and cred. fees | $ 18,000.00 |
| | SUBTOTAL | $361,235.13 |
| b. | interest from 9/7/96 as of 6/18/97 | $ 53,432.69 |
| c. | default penalty of 5% | $ 3,562.16 |
| | SUBTOTAL | $418,229.98 |
| d. | renewal charges of 10%: | $ 41,823.00 |
| e. | costs | $ 12,000.00 |
| f. | courier charges | $ 12,000.00 |
| g. | attorney's fees | $ 10,000.00 |
| h. | creditor fees | $ 10,000.00 |
| | TOTAL AMOUNT | $504,052.98 |

v. Other expenses:

| | | |
|---|---|---|
| a. | expenses and creditor's fees Inabón bankruptcy filing as of 5/14/97 | $ 87,044.45 |
| b. | expenses and attorney's fees Inabón bankruptcy filing as of 5/14/97 | $ 30,000.00 |
| c. | prior financial agreement | $247,353.00 |
| d. | expenses, title search, attorney's fees, deed | $ 3,579.00 |
| | TOTAL AMOUNT | $367,976.45 |

Thus, the total amount which Hernández Torres, Mrs. Ortiz and Dr. Hernández agreed to pay to the Hattons as of May 15, 1997, totaled $7,195,339.89. Joint Exhibit XII at pp. 2–4; written stipulation no. 29.

127. Hernández Torres, Mrs. Ortiz and Dr. Hernández executed promissory notes for the principal amounts above described at a fixed interest rate of 18.75%. Exhibits EEE, FFF, GGG, HHH, and III.

128. In the "Renewal Agreement", the parties also agreed to include a clause providing that, should Hernández Torres, Mrs. Ortiz and Dr. Hernández file judicial or any other claim against Hatton as a result of all agreements included in the "Stipulation", or in the "Stipulation Agreement" or in the "Renewal Agreement", they would pay Hatton an amount equivalent to $250,000.00 as fees, as well as attorney's fees at the same rate of $250.00 per hour. Joint Exhibit XII.

129. Likewise, in the "Renewal Agreement", Hernández Torres, Mrs. Ortiz and Dr. Hernández also agreed to release and relieve Hatton from all liability directly or indirectly related to all agreements included in the "Renewal Agreement". Joint Exhibit XII.

130. Furthermore, in the "Renewal Agreement", Hernández Torres, Mrs. Ortiz and Dr. Hernández acknowledged and attested to the validity, authenticity, legitimacy and legality of all amounts owed to Hatton (which amounts include the charges and fees claimed in this proceeding as unreasonable); and agreed to waive any and all defenses or any claims against Hatton in the event that Hatton needed to file a judicial claim, before any court of law, including this Bankruptcy Court, to collect the amounts owed by Hernández Torres, Mrs. Ortiz and Dr. Hernández.

131. In December 1997, Hernández Torres, Mrs. Ortiz and Dr. Hernández filed for bankruptcy.

132. All due dates for Inabón, Hernández Torres, Mrs. Ortiz and Dr. Hernández' payment of their obligations to Hatton are due and yet still not fully paid.

133. The Hattons' expert testified that, as of June 2002, the amount of the balance of the debt was 12.7 million dollars [21]. Trial transcript 2/10/05, dkt. no. 79 at p. 15.

134. Economist Joaquin Villamil determined that an analysis of Inabón's financial statements, Robert Morris parameters and Z–Score reflected a "highly real risk" operation. The Altman Z–Score was negative, minus 3.3; further, pursuant to Robert Morris factors, the operation was below 65% of the industry in sales to receivables, 84% below the industry in cost to sales, profits were negative, and it had a 74% higher risk factor than the average business incorporated in the industry. Trial transcript 2/10/05, dkt. no. 79 at pp. 9, 10 and 13.

135. Mr. Villamil concluded that the 18.75% annual interest bargained for and agreed by the parties was not unreasonable given the degree of risk found in the operation of Inabón's business. Trial transcript 2/10/05, dkt. no. 79 at pp. 99–100.

136. Mr. Villamil also concluded that the charges and interest were reasonable and not severe or oppressive and the total amount of claims do not seem to be unreasonable to him, based upon his analysis. Trial transcript 2/10/05, dkt. no. 790 at pp. 13–15.

137. With regards to collateral for a loan, Mr. Villamil indicated "[i]t has a great deal to do with the possibility of the creditor maybe recuperating some of his

---

**21.** Said statement assumes that the debts are fully secured, and therefore continued to accrue post-petition interest, fees and charges as provided for in the financial agreements.

at-risk investment, but it does not affect the risk of the loan itself." Trial transcript 2/10/05, dkt. no. 79 at p. 51.

### Claims Analysis

*The Hattons' Proof of Claims in the Inabón case:*

In the Inabón bankruptcy case, the Hattons have filed three claims:

1. They filed claim no. 119 on November 12, 1996, in the amount of $321,750.00 unsecured and $4,523,894.76 secured, for a total of $4,845,644.76. The basis for the claim is "money loaned" and "breach of financial agreements" and the proof of claim states that the claim is secured by real estate. Attached to the claim as Exhibit A is a detail of the claim, indicating that the secured claim has four parts, each with principal and interest, the principal amounts being $441,900.00, $2,859,443.00, $262,343.00 and $846,903.00 [22]. Interest is calculated on each of these amounts as of August 6, 1996, the date of the filing of the petition, for a total secured claim of $4,523,894.76.

Also attached to the claim is a letter from SOMO to Alfonso Hernandez Torres, dated June 1, 1996, regarding a loan in the amount of $742,500.00 and a second letter of the same date and between the same parties regarding a loan in the amount of $2,475,000.00. The unsecured portion of the claim consists of 10% of each of these loan amounts. It is not clear to the court whether these loans were actually dis-

bursed; no evidence regarding said loans was introduced at trial.

There is no evidence of perfection of a security interest, nor a description of the real estate securing the debt, attached to this claim. The agreements upon which the four secured debts are based are not attached to the claim.

2. They filed claim no. 235 on July 2, 2001, in the amount of $903,333.40 as a secured debt. The claim indicates that it amends the claim previously filed on November 12, 1996. The basis for the claim is "penalty for presentation of a frivolous complaint" and it states that it is secured by real estate valued at $20,000,000.00. Attached to the claim is a detail of the 20% penalty claimed owed on each of five notes [23], totaling the amount claimed. However, there is no evidence of perfection of security interest, nor a description of the real estate securing the debt, attached to this claim.

3. They filed claim no. 287 on December 12, 2005 (post-trial), in the amount of $270,884.00 unsecured and $9,223,988.50 secured, for a total of $9,494,872.50. The basis for the claim is "money loaned" and "breach of financial agreements" and it is secured by collateral valued at $25,000,000.00. This claim does not indicate that it amends or replaces a previously-filed claim.

Attached to this claim is an "itemized statement of debt" detailing the amount owed as of August 31, 2005. It includes a payment of $40,866.00 towards the unse-

---

**22.** These amounts correspond to those in the Settlement Agreement of June 18, 1996, relating to the management agreement debt, the second loan, the financial agreement debt, and the first loan, respectively.

**23.** As has been stated throughout this opinion, there were four debts and four corresponding notes, at least until the "Agreement for the Renewal of Obligations" (Exhibit XII)

executed on May 15, 1997, which added a fifth. The attachment to this proof of claim includes both the $846,903.00 owed on the first loan and the $98,706.50 owed as the balance on the first loan, taking into account the assignment of $750,000.00 to that debt from the sale of property. In other words, the $98,706.50 debt is part of the $846,903.00 debt. See footnotes 8 and 13.

cured debt on April 8, 2003. It also lists 4 promissory notes with principal amounts of $2,859,443.00, $449,900.00 [24], $262,353.00 and $98,706.50, then calculates interest, late fees, etc. to arrive to the total amount as of July 13, 2001 of $8,638,910.70, then credits a payment on July 13, 2001 of $2,447,000.00, resulting in a balance of $6,191,910.70.

The attachment then states that the principal amount as of July 13, 2001 is $4,249,310.50, then reduces that amount by a $750,000.00 payment on July 13, 2001, resulting in a principal balance on July 14, 2001 of $3,499,310.50. The attachment then has a calculation of interests, fees, etc. on this "new" principal amount, resulting in a new total of $9,494,872.50.

Also attached to this proof of claim are the letters which were attached to claim # 119; a copy of the "Estipulacion de Sentencia por Transaccion" of June 18, 1996, filed in the Superior Court (Exhibit PP); a note in the amount of $2,859,443.00 dated 6/18/96 (Exhibit QQ); a note in the amount of $449,261.50 dated 6/18/96 (Exhibit RR); a note in the amount of $262,353.00 dated 6/18/96 (Exhibit SS); and a note in the amount of $98,706.50 dated 6/18/96 (Exhibit TT); as well as a bearer note in the amount of $603,348.00 dated 12/7/95 (Joint Exhibit V), a mortgage note in the amount of $315,000.00 dated 7/16/92 (Exhibit FF), a mortgage note in the amount of $1,500,000.00 dated 1/2/96 [25] and a mortgage note in the amount of $441,900.00 dated 6/18/96 (Exhibit YY). These documents do not indicate which real estate is serving as collateral securing the claims.

*The Hattons' Proof of Claims in the Hernández Torres case:*

In the Hernández Torres case, the Hattons have filed three claims:

1. They filed claim no. 9, which appears to have been acquired by them from ADP, Alarmas de Ponce, Inc.

2. Hatton filed claim no. 10 on March 2, 1998, in the amount of $7,856,780.65 as an unsecured claim based upon "money loaned". Attached to the claim is an itemized statement which refers to five principal amounts, plus interest and late charges. The principal amounts listed are as of June 19, 1997, but are the same as the amounts in the "Agreement for the Renewal of Obligations" (Exhibit XII) which was executed on May 15, 1997; to said amounts are added the interest and late charges calculation as of December 5, 1997, the approximate date of the filing of the Hernández Torres' bankruptcy petition, for a total unsecured claim of $7,856,780.65. Also attached to the claim is a summary of exhibits listing:

1. Partial Judgment entered on August 9, 1996 by the Superior Court.

2. "Acuerdo en Relación a Estipulación de Sentencia Por Transacción" executed on September 7, 1996.

3. "Acuerdo Sobre Renovación De Obligaciones" executed on May 15, 1997.

4. Promissory note for the principal amount of $1,327,504.00 executed by Hernández Torres and his wife on May 15, 1997.

---

**24.** This amount does not correspond to the $441,900.00 claimed in the first proof of claim, which is based upon the original amount agreed upon by the parties for the breach of the management agreement on June 2, 1996 in the "Acuerdo", nor to the mortgage note in the amount of $441,900.00 executed on June 18, 1996 (Exhibit YY) and

attached to the claim. A promissory note in the amount of $449,261.50 (Exhibit RR) was also executed along with the "Stipulation" on June 18, 1996 (Exhibit PP). See footnote 13.

**25.** This mortgage note was not entered into evidence at trial; however, the mortgage guaranteeing it is Exhibit N.

5. Promissory note for the principal amount of $367,976.45 executed by Hernández Torres and his wife on May 15, 1997.

6. Promissory note for the principal amount of $4,244,684.50 executed by Hernández Torres and his wife on May 15, 1997.

7. Promissory note for the principal amount of $504,052.98 executed by Hernández Torres and his wife on May 15, 1997.

8. Promissory note for the principal amount of $751,121.96 executed by Hernández Torres and his wife on May 15, 1997.

9. "Acuerdo Sobre Limitación de Crédito Hipotecario y Constitución de Prenda Secundaria" executed by Hernández Torres and others on May 15, 1997.

10. "Acuerdo Sobre Limitación de Crédito Hipotecario y Constitución de Prenda Secundaria" executed by Hernández Torres and others on May 15, 1997.

3. They filed claim no. 26 on July 6, 2001, in the amount of $903,333.40 as a secured debt. This claim indicates that it amends the claim of November 12, 1996; however, there was no claim filed on November 12, 1996 in the Hernández Torres case, only in the Empresas Inabón case. The basis for the claim is "penalty for presentation of a frivolous complaint" and it states that it is secured by real estate valued at $20,000,000.00. Attached to the claim is a detail of the 20% penalty claimed owed on each of five notes, totaling the amount claimed. However, there is no evidence of perfection of a security interest, nor a description of the real estate securing the debt, attached to this claim. This claim is the same as the second claim filed by Hatton in the Inabón case (claim # 235 therein), described above; see also footnote 17.

*The Hattons' Proof of Claims in the Hernández Ortiz case:*

In the Hernández Ortiz case, the Hattons have filed three claims:

1. Hatton filed claim no. 13 on March 2, 1998, the amount of $7,856,780.65, based upon "money loaned" and secured by property valued at $12,000,000.00. Attached to the claim is a "summary of exhibits" and an "itemized statement" (the same ones filed with claim no. 10 in the Hernández Torres case), as well as title searches on two Ponce properties in Barrio Canas, *finca* # 18,645 (with a notation that Hatton has second and third liens) and *finca* # 11,039 (with a notation that Hatton has second and fourth liens).

2. The Hattons filed claim no. 14, which appears to have been acquired by them from ADP, Alarmas de Ponce, Inc.

3. They filed claim no. 25 on July 6, 2001, in the amount of $903,333.40 as a secured debt. This claim indicates that it amends the claim of November 12, 1996; however, there was no claim filed on November 12, 1996 in the Hernández Torres case, only in the Empresas Inabón case. The basis for the claim is "penalty for presentation of a frivolous complaint" and it states that it is secured by real estate valued at $20,000,000.00. Attached to the claim is a detail of the 20% penalty claimed owed on each of five notes, totaling the amount claimed. However, there is no evidence of perfection of security interest, nor a description of the real estate securing the debt, attached to this claim. This claim is the same as the second claim filed by Hatton in the Inabón case (claim # 235 therein), described above; see also footnote 17, as well as the third claim filed by Hatton in the Hernández Torres case (claim # 26 therein), described above.

*Secured Status of the Hattons' Claims*

*The First Loan*

The first loan was executed on December 7, 1995, between ALRA, represented by its president, Hernández Torres, and SOMO in the amount of $603,348.00 (Join Exhibit V). In guarantee of the repayment of this loan, ALRA pledged to SOMO a note, payable to bearer, in the amount of $603,348.00 (Exhibit B), guaranteed by a first mortgage on the following property, described in the loan agreement in the Spanish language:

> RUSTICA. Parcela de terreno con una cabida de CINCO PUNTO DOS MIL CINCUENTA Y CUATRO CUERDAS, equivalentes a DIECINUEVE MIL OCHOCIENTOS SESENTA Y DOS PUNTO CUATRO MIL CUATRO-CIENTOS CINCUENTA Y OCHO METROS CUADRADOS y en lindes por el NORTE, con la Urbanización Punto Oro; por el SUR, con la Carretera Estatal Número Dos; por el ESTE, con parcela segregada y por el OESTE, con parcela propiedad de la Autoridad de Acueductos y Alcantarillados de Puerto Rico.

Said property is inscribed in the property registry as a property non-continuous to a larger piece of land of 7.7,563 "cuerdas", equivalent to 29,886.8,925 square meters, located in Barrio Canas, in the municipality of Ponce, Puerto Rico, inscribed at page 296 of volume 721 of Ponce II, property number 38,625, now 55 of section II of Ponce, inscription number 152. The loan agreement further provides that ALRA has an agreement with the Puerto Rico Highway Authority for the purchase of the pledged land for a price of $750,000.00, and that ALRA cedes a portion of this agreed sales price ($603,348.00) to SOMO as an additional guarantee of the loan, with certain specified conditions [26].

*The Second Loan*

The second loan was executed on January 2, 1996, between Inabón, represented by Hernández Torres, and SOMO in the amount of $2,475,000.00 (see Loan Agreement, Joint Exhibit VII, and promissory note, Exhibit H). According to the loan agreement, in guarantee of the repayment of this loan, Inabón gave to SOMO several notes; first, a mortgage note payable to bearer in the amount of $500,000.00 [27], executed by Hernández Ortiz and guaranteed by a mortgage constituted by deed no. one executed on that same date (Exhibit O); second, a mortgage note payable to bearer in the amount of $475,000.00 (Exhibit I), executed by Hernández Ortiz and guaranteed by a mortgage constituted by deed no. three executed on that same date (Exhibit P); third, a mortgage note payable to bearer in the amount of $315,000.00 (Exhibit FF), executed by Inabón and guaranteed by a mortgage constituted by deed no. twelve executed on July 16, 1992 [28];

---

**26.** The Cession Contract, dated December 7, 1995, and signed by Hernández Torres, on behalf of ALRA (but not signed by the Highway Authority), is Exhibit A.

**27.** Said note was not entered into evidence at the trial held in January and February, 2005.

**28.** Said mortgage was not entered into evidence at the trial held in January and February, 2005. According to a fax from Citibank to Inabón dated February 12, 1996 (Exhibit EE), the original of Exhibit FF was delivered to Hatton on January 4, 1996, in exchange for his payment of a loan from Citibank to Inabón in the amount of $350,000.00, per the instructions of Hernández Torres. The court does not have in evidence a description of the property securing the referenced mortgage note.

*See also*, Stipulated finding of Fact no. 6, indicating that $350,000 was deducted from the proceeds of the second loan to pay this mortgage.

fourth, a mortgage note payable to bearer in the amount of $1,500,000.00 [29], executed by Inabón and guaranteed by a mortgage constituted by deed no. two executed on January 2, 1996 (Exhibit N); and, fifth, by the personal guarantee of Hernández Ortiz (Exhibit K) and Hernández Torres and his wife (Exhibit J). See also, "Pledge Contract and Continuing Guaranty", executed on January 2, 1996, whereby Hernández Ortiz pledges to SOMO, in guaranty of the second loan, two of the bearer mortgage notes described above, those of $500,000.00 and $475,000.00 (Exhibit L); and "Pledge Contract", executed on January 2, 1996, whereby Hernández Torres, on behalf of Inabón, pledges to SOMO, in guaranty of the second loan, two of the bearer mortgage notes described above, those in the amount of $315,000.00 and $1,500,000.00 (Exhibit M). On January 2, 1996, Inabón, SOMO, Hernández Ortiz and Westernbank also executed an "Acuerdo Sobre Limitacion de Credito Hipotecario y Constitución de Prenda Secundaria", which indicates that Westernbank is the holder of two bearer mortgage notes in the amount of $1,500,000.00 each, the first constituted by deed no. 448 executed on May 11, 1994 [30], and the second constituted by deed no. 954 executed on September 15, 1995 [31], and provides that Hernández Ortiz is executing a secondary pledge of said mortgage notes to SOMO; and that SOMO is designating Westernbank as the depository of the mortgage notes until the obligations of Inabón and Hernández Ortiz to Westernbank are satisfied, at which time Westernbank should deliver the notes to the Hattons.

The mortgage guaranteeing the promissory note in the amount of $500,000.00 (Exhibit O) indicates that it is over the following property, described, in part, in the Spanish language as follows:

RUSTICA: Parcela de terreno radicada en el Barrio Canas del término municipal de Ponce, Puerto Rico, con un área superficial de treinta y siete mil ciento ochenta y cinco punto ocho mil ciento veintiocho (37,185.8128) metros cuadrados, equivalentes a nueve punto cuatro mil seiscientos once (9.4611) cuerdas.

(See Exhibit O for a complete property description). The mortgage indicates that the described property is subject to several easements, as well as a mortgage in guarantee of a bearer note in the amount of $1,500,000.00, constituted by deed no. 448 executed on May 11, 1994 [32].

The mortgage guaranteeing the promissory note in the amount of $475,000.00 (Exhibit P) indicates that it is over the following property, described, in part, in the Spanish language as follows:

RUSTICA: Parcela de terreno radicada en el Barrio Canas del término municipal de Ponce, Puerto Rico, compuesta de cuarenta y seis punto siete mil novecientos setenta y siete (46.7977) cuerdas equivalentes a ciento ochenta y tres mil novecientos treinta y tres punto seis mil setecientos cincuenta y cuatro (183,-933.6754) metros cuadrados la cual se compone de las siguientes porciones:....

29. Said note was not entered into evidence at the trial held in January and February, 2005.

30. Said mortgage is over the property securing the $500,000.00 promissory note of Hernández Ortiz, described in the paragraph below.

31. Said mortgage is over the property securing the $475,000.00 promissory note of Hernández Ortiz, described below.

32. Said mortgage being one of two subject of the "Acuerdo Sobre Limitacion de Credito Hipotecario y Constitución de Prenda Secundaria" between Hernández Ortiz and Westernbank.

The property description then details that the land is divided into Parcel "A" of 45.9258 "cuerdas", which is equivalent to 180,506.75 square meters, and is further divided into Remnant I and Remnant II, the latter of which is further divided into two portions; Parcel "B" of .7887 "cuerdas", which is equivalent to 3,099.8985 square meters; Parcel "C", which is described in the lotification plan of project number 87–63–A–287–CGI—Urb. Extensión Punto Oro VM–139 as lot number 13 of block "OP", composed of .0411 "cuerdas", which is equivalent to 161.5390 square meters; and Parcel "D", which is described in the lotification plan of project number 87–63–A–287–CGI—Urb. Extensión Punto Oro–VM–139 as lot number 6 of block "KL", composed of .0421 "cuerdas", which is equivalent to 165.4694 square meters. (See Exhibit P for a complete property description.) The mortgage note states that it is second in rank, the first mortgage being one in the amount of $1,500,000.00 constituted by deed no. 954 executed on September 15, 1995 [33].

The mortgage guaranteeing the promissory note in the amount of $1,500,000.00 (Exhibit N) indicates that it is over the following property, described, in part, in the Spanish language as follows:

RUSTICA: Parcela de terreno radicada en el Barrio Canas del término municipal de Ponce, Puerto Rico, con un área superficial de ciento cuarenta y siete mil ciento diez punto dos mil ciento sesenta y seis (147,110.2166) metros cuadrados, equivalentes a treinta y siete punto cuatro mil trescientos trece (37.4313) cuerdas.

(See Exhibit N for complete property description).

*The Management Agreement and Financial Agreement*

On January 24, 1996, Inabón, Hernández Torres and his wife, Hernández Ortiz and Hatton executed an Executive Management Services Agreement (Exhibit VIII), whereby the parties agreed that Hatton would manage the operations of Inabón. The individual debtors are referred to as "guarantors" in the management agreement. The management agreement does not set forth any security for the compensation and benefits to be provided to Hatton.

On that same date, the individual debtors, Inabón and SOMO executed a Financial Agreement (Exhibit IX), whereby SOMO agreed to provide Inabón up to four million dollars in financing. The individual debtors are referred to as "guarantors" in the financial agreement and through it agree to provide their personal, joint guarantees, as well as mortgages over the following properties:

37 "cuerdas" parcel at Canas Ward in Ponce

9.46 "cuerdas" parcel at Canas Ward in Ponce

19.54 "cuerdas" parcel at Canas Ward in Ponce

6.33 "cuerdas" parcel at Canas Ward in Ponce

12 "cuerdas" parcel at Canas Ward in Ponce

other parcels owned at Canas Ward in Ponce

However, there is no evidence in the record that any promissory or mortgage notes were actually executed to provide security for the financial agreement.

33. *Id.*

*The "Acuerdo"*

In the "Acuerdo" signed by the parties on June 2, 1996 (Exhibit OO), the debt regarding the first loan was reduced by $24,439.89, and amount retained by SOMO from the original loan proceeds for "Proporty [sic] Insurance" (Retenido Embargo) (see Exhibit C "Details of Loan Disbursement"), leaving a balance of $578,908.11, to which interest, fees and costs were added, resulting in a new total of $845,777.74. The "Acuerdo" also acknowledges that the debt was purchased by Hatton from SOMO.

The debt regarding the second loan was reduced to $2,391,500.00, to which interest, fees and costs were added, resulting in a new total of $2,800,409.70 [34]. Additionally, the parties agreed to pay Hatton $441,900.00 for the cancellation of the Executive Management Agreement and $262,353.00 for the cancellation of the Financial Agreement. Thus, the total revised obligation of the debtors to the Hattons was $4,500,440.40 [35] as per the "Acuerdo". No additional security was granted for this debt.

*The "Stipulation"*

In the "Stipulation" signed by the parties on June 18, 1996 (Exhibit PP), sixteen days after the "Acuerdo", the debt regarding the first loan was recalculated to total $846,903.00. It was acknowledged that to partially satisfy this debt, ALRA cedes to Hatton the total price of $750,000.00 of the sale of a parcel of land of 5.2054 cuerdas, located in Barrio Canas, to the Puerto Rico Highway Authority. Further, it notes that in consideration of this cession, Hatton will "free" parcels 019–00B, 019–01 and 019–03, as identified in ALRA's inscription plan, said parcels to be ceded to the Highway Authority for public use. The "Stipulation" further provides that the $96,903.00 balance remaining, after the application of the $750,000.00, is guaranteed by Inabón, Hernández Torres and Hernández Ortiz, evidenced by a note (Exhibit TT), which is signed by Hernández Torres on behalf of Inabón, as well as by Hernández Torres, his wife, and Hernández Ortiz in their individual capacity as guarantors. Actually, although the "Stipulation" refers to one note, there is a second mortgage note (Exhibit UU), executed by Hernández Ortiz on June 18, 1996, in the amount of $100,000.00, guaranteed by a mortgage (no. 63), executed on June 18, 1996, in the amount of $100,000.00 over a piece of land of 46.7977 "cuerdas", consisting of various parcels and remnants, property of Hernández Ortiz, located in Barrio Canas in Ponce, Puerto Rico (see Exhibit VV for a complete property description). Said mortgage states that the title is affected by an easement held by the Electric Energy Authority, the Acueduct and Sewer Authority, the Puerto Rico Telephone Company; by a mortgage in guarantee of a bearer note in the amount of $1,500,000.00 pursuant to deed no. 954 executed on September 15, 1995; and by a mortgage in guarantee of a bearer note in the amount of $475,000.00 pursuant to deed no. 3 executed on January 2, 1996 [36].

The debt related to the second loan was recalculated to a new total of $2,859,443.00, and is evidenced by a promissory note (Exhibit QQ), which is signed by Hernández Torres on behalf of Inabón, as well as by Hernández Torres, his wife, and Hernández Ortiz in their individual capacity as guarantors. No additional security was granted for this portion of the debt.

---

**34.** See footnote 7, supra.

**35.** See footnote 8, supra.

**36.** One of the mortgages mentioned above, guaranteeing the second loan at the time it was executed.

The debt related to the management agreement was recalculated to a new total of $441,900.00 [37], and is evidenced by a promissory note (Exhibit RR), which is signed by Hernández Torres on behalf of Inabón, as well as by Hernández Torres, his wife, and Hernández Ortiz in their individual capacity as guarantors. The stipulation provides that this debt is guaranteed by a mortgage in the amount of $441,900.00 over a parcel of land of 37.4313 "cuerdas" in Barrio Canas in Ponce, Puerto Rico (Exhibits YY (note) and ZZ (deed)). The stipulation further provides that, as an additional guarantee, Hernández Ortiz is delivering to Hatton a bearer mortgage note in the amount of $520,000.00 over a parcel of land of 9.4611 "cuerdas" that he owns (Exhibit WW), guaranteed by a mortgage (no. 64) executed on June 18, 1996 (Exhibit XX) which indicates that the property is already subject to several easements, a mortgage in the amount of $1,500,000.00 constituted by deed no. 448 executed on May 11, 1994, and a mortgage in the amount of $500,000.00 constituted by deed no. 3 executed on January 2, 1996.

The debt related to the financial agreement was recalculated to a new total of $262,353.00, and is secured by a promissory note (Exhibit SS), which is signed by Hernández Torres on behalf of Inabón [38]. The stipulation further provides that this debt is also guaranteed by "the mortgage notes in Hatton's possession", without specifying to which mortgages it is referring.

### The "Stipulation Agreement"

On August 9, 1996, the Superior Court entered partial judgment approving the "Stipulation" of June 18, 1996 (Exhibit X).

On September 7, 1996, the individual debtors and the Hattons further renewed and renegotiated their financial agreements and entered into an "Acuerdo en Relación a Estipulación de Sentencia por Transacción" ("Stipulation Agreement") (Exhibit XI), through which the parties agreed to postpone payment of the amounts owed to Hatton and renewed the obligations under the "Stipulation" in order to grant Inabón time to reorganize. In the stipulation agreement, the parties recalculated the debt to Hatton to be $1,009,962.25 regarding the first loan, $3,305,429.61 regarding the second loan, $556,419.29 regarding the management agreement, and $343,235.13 regarding the financial agreement. Although the stipulation agreement indicates that the obligations therein would be evidenced by four promissory notes, said notes were not presented in evidence to the court. Additionally, in the stipulation agreement, the individual debtors agreed to pay the Hattons $18,000.00 for fees and costs. No additional security for the debts was executed as part of this agreement.

### The "Renewal Agreement"

On May 15, 1997, the individual debtors and the Hattons executed an "Acuerdo Sobre Renovacion de Obligaciones" ("Renewal Agreement") (Exhibit XII), at the request of Hernández Torres (Exhibit DDD), through which they again renegotiated their financial agreements. The debt related to the first loan was recalculated to a new total of $1,327,504.00, and the individual debtors executed a promissory note in that amount (Exhibit GGG). The debt related to the second loan was recalculated to a new total of $4,244,684.50, and the individual debtors executed a promissory

37. See footnote 13, supra.

38. Although page 3 of said exhibit is missing from the document entered into evidence, the court presumes that, like the other notes, it had a third page containing the signatures of the individual debtors, as well as the notary's seal.

note in that amount (Exhibit FFF). The debt related to the management agreement was recalculated to a new total of $751,121.96, and the individual debtors executed a promissory note in that amount (Exhibit EEE). The debt related to the financial agreement was recalculated to a new total of $504,052.98 [39], and the individual debtors executed a promissory note in that amount (Exhibit HHH). Additionally, the individual debtors agreed to pay the Hattons a total of $367,976.45 for fees, costs, and a "prior financial agreement" and executed a promissory note in that amount (Exhibit III).

The "Renewal Agreement" provides that, in addition to the guarantees already made, the obligations therein will be guaranteed by "Contratos Sobre Limitación De Crédito Hipotecario y Constitución de Prenda Secundaria", executed that same date. The referred documents, executed by Hernández Torres as the president of Llanos del Sur Corporation, consist of a mortgage note in the amount of $450,000.00 (Exhibit JJJ); mortgage deed no. 5 constituting a mortgage in the amount of $450,000.00 over several parcels of land identified as L–35, L–36, L–37, and L–38 (see Exhibit KKK for complete property description); a pledge agreement (Exhibit LLL), pledging the previously-described bearer mortgage note; and an "Acuerdo Sobre Limitacion de Creditor Hipotecario y Constitucion de Prenda Secundaria" (Exhibit MMM) between Westernbank, Llanos del Sur Corporation, the Hattons, and Hernández Torres and his wife, as well as an "Acuerdo Sobre Limitación de Credito Hipotecario y Constitución de Prenda Secundaria" (Exhibit NNN) between Leafar Construction, Inc., Llanos del Sur Corporation, the Hattons, and Hernández Torres and his wife.

The mortgage indicates that, in addition to various easements, the properties are subject to various other mortgages; namely, parcel L–35 is subject to bearer mortgage note in the amount of $93,000.00; parcel L–36 is subject to a bearer mortgage note in the amount of $93,000.00; parcel L–37 is subject to bearer mortgage note in the amount of $93,000.00; and parcel L–38 is subject to a bearer mortgage note in the amount of $121,000.00. Additionally, all four parcels are subject to a bearer mortgage note in the amount of $330,000.00. The first "Acuerdo Sobre Limitacion" indicates that Westernbank is the holder of the aforementioned bearer mortgage notes in the amounts of $93,000.00 over parcels L–35, L–36 and L–37, and the note in the amount of $121,000.00 over parcel L–38, and provides that Llanos del Sur is executing a second pledge of said mortgage notes to the Hattons; and that the Hattons are designating Westernbank as the depository of the mortgage notes until the obligations of Llanos del Sur to Westernbank are satisfied, at which time Westernbank should deliver the notes to the Hattons. The second "Acuerdo Sobre Limitacion" indicates that Leafar Construction is the holder of the aforementioned bearer mortgage note in the amounts of $330,000.00 over all four parcels, and provides that Llanos del Sur is executing a second pledge of said mortgage notes to the Hattons; and that the Hattons are designating Leafar Construction as the depository of the mortgage notes until the obligations of Llanos del Sur to Leafar Construction are satisfied, at which time Leafar Construction should deliver the notes to the Hattons.

---

**39.** Said amount includes the $18,000.00 in fees and costs added in the "Stipulation Agreement". See Exhibit XII at p. 3.

*Summary of Secured Status of the Hattons' Claims Against Inabón*

Inabón filed its bankruptcy petition on August 6, 1996, seven weeks after the execution of the "Stipulation" on June 18, 1996. The court finds that, as of the filing of its bankruptcy petition, Inabón was indebted to the Hattons in the amount of $4,523,894.76. Said amount is the total of the debts owed as per the "Stipulation" (Exhibit PP), plus interest calculated as of the petition filing date, and corresponds to the secured portion of the first proof of claim, number 119, filed by the Hattons in Inabon's case on November 12, 1996. This debt consists of four parts, previously described in detail—that is, the first loan, the second loan, the management agreement debt, and the financial agreement debt.

The first loan, originally in the amount of $603,348.00, is secured by a first mortgage on a property of 5.2054 "cuerdas" in Barrio Canas, Ponce; said property was under contract to be sold to the Puerto Rico Highway Authority for $750,000, and an agreement was executed to assign the proceeds of that sale to Hatton. Thus, on its face, the first loan was oversecured on the date of its execution.

The second loan, originally in the amount of $2,475,000.00 is secured by two mortgage notes over property owned by Hernández Ortiz, in the amount of $500,000.00 and $475,000.00, and two mortgage notes over property owned by Inabón, in the amount of $315,000.00 and $1,500,000.00, for a total security of $2,790,000.00. Thus, on its face, the second loan was oversecured "in total" on the date of its execution, although it was secured in the amount of $1,815,000.00 as to Inabón and in the amount of $975,000.00 as to Hernández Ortiz. However, since the court does not know the value of the properties securing the debts, it is not able to determine whether the value of the properties exceeds the mortgages on them. For example, the $500,000.00 mortgage note pertains to a property of 9.4611 "cuerdas" in Barrio Canas, Ponce, and is second in rank to a mortgage of $1,500,000.00 executed on May 11, 1994. The $475,000.00 mortgage note pertains to a property of 46.7977 "cuerdas" in Barrio Canas, Ponce, and is second in rank to a mortgage of $1,500,000.00 executed on September 15, 1995. The mortgage securing the $315,000.00 note was not entered into evidence; therefore, the court does not know to what property it pertains nor what rank it holds. The $1,500.000.00 mortgage note is over a property of 37.4313 "cuerdas" in Barrio Canas, Ponce, and states that the property is subject to several easements, as well as a federal attachment in the amount of $80,653.84.

In the "Acuerdo" of June 2, 1996, the debt pertaining to the first loan was recalculated to $845,777.74; assuming the value of the property securing said debt was its sale price of $750,000.00, that debt was now undersecured. The debt pertaining to the second loan was recalculated to $2,800,409.70; assuming the value of the property securing said debt was $2,790,000.00, that debt was now undersecured. The parties also agreed that the debtors would pay the Hattons $441,900.00 for the cancellation of the management agreement and $262,353.00 for the cancellation of the financial agreement; however, there was no security for these debts, originally or in the "Acuerdo"; therefore, at that time, they were unsecured.

In the "Stipulation" of June 18, 1996, the debt pertaining to the first loan was recalculated to $846,903.00; the parties acknowledge the credit of the $750,000.00 sale price of the property securing the debt and the individual debtors executed a promissory note for the balance of $96,903.00, but no additional security was

given by Inabón for this debt (although a mortgage was given by Hernández Ortiz); therefore, this debt remains undersecured as to Inabón. The debt pertaining to the second loan was recalculated to $2,859,443.00; no additional security was given and the debt remains undersecured as to Inabón. The debt pertaining to the management agreement was recalculated to $441,900.00 [40] and is secured by a mortgage second in rank over a property of 37.4313 "cuerdas" in Barrio Canas in Ponce, that property being already subject to a mortgage of $1,500,000.00 securing the second loan, as well as a federal attachment in the amount of $80,653.84, mentioned above. Thus, on its face, this debt is fully secured as to Inabón, although the court does not have information as to the value of the security. Additional security for this debt was given by Hernández Ortiz. Finally, the debt pertaining to the financial agreement was recalculated to a new total of $262,353.00; no security was offered for this debt—originally, in the "Acuerdo", nor in the "Stipulation"; therefore, it appears to be unsecured.

To summarize, as of the date of the "Stipulation", Inabón's debt to the Hattons totals $1,403,699.00 in unsecured debt ($96,903.00 re: the first loan, 1,044,443.00 re: the second loan and $262,353.00 re: the financial agreement debt) and $3,006,900.00 in secured debt ($750,000.00 re: the first loan, $1,815,000.00 re: the second loan, and $441,900.00 re: the management agreement), plus $113,295.59 in interest as of the filing date of the petition, as per proof of claim no. 119, for a total of $4,523,894.76. The classification of portions of this debt as "secured" and "unsecured" is subject to the verification of the value of the collateral securing said debts, and from this claim total must be subtracted any payments received by the Hattons

on their claims during the course of these bankruptcy proceedings, as well as any payments received from the estates of Hernández Torres and Hernández Ortiz on the claims filed in those cases.

*Summary of Secured Status of the Hattons' Claims Against Hernández Torres*

Hernández Torres filed his bankruptcy petition on December 7, 1997, approximately seven months after the execution of the "Renewal Agreement". It does not appear from the record that Hernández Torres offered any collateral to secure the debts he assumed to the Hattons, a fact acknowledged by the Hattons with the filing of their proof of claim no. 10 on March 2, 1998 in the Hernández Torres case in the amount of $7,856,780.65 as an unsecured debt. The court concludes that Hernández Torres is indebted to the Hattons, jointly with Inabón and Hernández Ortiz, in the amount of $7,856,780.65 as an unsecured debt.

*Summary of Secured Status of the Hattons' Claims Against Hernández Ortiz*

Hernández Ortiz filed his bankruptcy petition on December 7, 1996, approximately seven months after the execution of the "Renewal Agreement". The court finds that, as of the filing of his bankruptcy petition, Hernández Ortiz was indebted to the Hattons in the amount of $7,856,780.65. Said amount is the total of the debts owed as per the "Renewal Agreement" (Exhibit XII), that is, $7,195,339.89, plus interest calculated as of the petition filing date, and corresponds to the first proof of claim, number thirteen, filed by the Hattons on March 2, 1998 in the Hernández Ortiz bankruptcy case. This debt consists of five parts, previously described in detail—that is, the first loan, the second loan, the management agreement debt, the financial agreement debt,

---

**40.** See footnotes 13 and 32, supra.

and the additional fees and costs agreed to at the time of the execution of the "Renewal Agreement".

As stated above, the first loan was initially secured by a property owned by Inabón. Hernández Ortiz executed a personal guaranty but did not secure said loan with his property. Accordingly, said debt was unsecured as to Hernández Ortiz.

The second loan, in the amount of $2,475,000.00, was secured in the amount of $975,000.00 as to Hernández Ortiz and in the amount of $1,815,000.00 as to Inabón. As detailed above, the properties mortgaged by Hernández Ortiz to secure the debt include a parcel of 9.4611 "cuerdas" in Barrio Canas, Ponce, with a mortgage in the amount of $500,000.00; and a parcel of 46.7977 "cuerdas" in Barrio Canas, Ponce, with a mortgage of $475,000.00. Each of said mortgages is second in rank, each property being subject to first mortgages in the amount of $1,500,000.00. Accordingly said debt was secured in the amount of $975,000.00 and unsecured in the amount of $1,500,000.00 as to Hernández Ortiz, assuming the value of the mortgaged properties equals or exceeds the value of the mortgages encumbering them.

Hernández Ortiz was a guarantor of the management agreement and financial agreement, but did not secure these agreements with any property.

In the "Acuerdo" executed on June 2, 1996, the debts related to the first loan and the second loan were recalculated, and amounts were agreed upon to be paid to the Hattons for the management agreement and the financial agreement. No additional security was granted by any of the debtors as part of the "Acuerdo".

In the "Stipulation" executed on June 18, 1996, the debts were again recalculated. The debt related to the first loan was set at $846,903.00; it was secured in the amount of $750,000.00 by Inabón through the pledge of the proceeds of the sale of a property, and the balance of $96,903.00 was secured by a mortgage executed by Hernández Ortiz in the amount of $100,000.00 on a property of 46.7977 "cuerdas" in Barrio Canas, Ponce. Therefore, this debt was unsecured in the amount of $746,903.00 and secured in the amount of $100,000.00 as to Hernández Ortiz. The debt pertaining to the second loan was recalculated to a new total of $2,859,443.00; no additional security was given, so this debt remains secured in the amount of $975,000.00 and unsecured in the amount of $1,884,443.00 as to Hernández Ortiz. The debt related to the management agreement was recalculated to a new total of $441,900.00 [41] and, in addition to being secured by a mortgage from Inabón, was also secured by a mortgage from Hernández Ortiz in the amount of $520,000.00 over a property of 9.4611 "cuerdas" located in Barrio Canas, Ponce, said mortgage being third in rank and said property being already encumbered in the amount of $2,000.000.00 [42]. Accordingly, the debt related to the management agreement was oversecured as to Hernández Ortiz as of the date of the execution of the "Stipulation". The debt pertaining to the financial agreement was recalculated to a new total of $262,353.00; although it states that it is secured by "the mortgage notes in Hatton's possession", no additional security was executed at that time and, therefore, that debt is unsecured as to Hernández Ortiz.

---

41. See footnotes 13, 32 and 35, supra.

42. The second rank mortgage being in the amount of $500,000.00 and securing the second loan when originally executed.

In the "Stipulation Agreement" entered into on September 7, 1996, subsequent to the filing of Inabón's bankruptcy petition, the parties again renegotiated the debts owed to the Hattons. However, no additional security was offered for the debts at that time. The debt related to the first loan was recalculated to a new total of $1,009,962.25; it is therefore secured in the amount of $100,000.00 and unsecured in the amount of $909,962.25 as to Hernández Ortiz. The debt related to the second loan was recalculated to a new total of $3,305,429.61; it is therefore secured in the amount of $975,000.00 and unsecured in the amount of $2,330,429.60 as to Hernández Ortiz. The debt related to the management agreement was recalculated to a new total of $556,419.29; it is therefore secured in the amount of $520,000.00 and unsecured in the amount of 36,419.29 as to Hernández Ortiz. The debt related to the financial agreement was recalculated to a new total of $343,235.13; it remains unsecured as to Hernández Ortiz. Additionally, the individual debtors agreed to pay the Hattons $18,000.00 for fees and costs; no additional security was executed in relation to said debt.

The "Renewal Agreement" was executed on May 15, 1997; through it the parties once again renegotiated their financial arrangements. The debt related to the first loan was recalculated to a new total of $1,327,504.00; said debt would now be secured in the amount of $100,000.00 and unsecured in the amount of $1,227,504.00 as to Hernández Ortiz. The debt related to the second loan was recalculated to a new total of $4,244,684.50; said debt would now be secured in the amount of $975,000.00 and unsecured in the amount of $3,269,684.50 as to Hernández Ortiz. The debt related to the management agreement was recalculated to a new total of $751,121.96; said debt would now be secured in the amount of $520,000.00 and

unsecured in the amount of $231,121.96 as to Hernández Ortiz. The debt related to the financial agreement was recalculated to a new total of $504,052.98, including the $18,000.00 agreed to by the parties in the "Stipulation Agreement"; it remains unsecured as to Hernández Ortiz in its entirety. Additionally, the individual debtors agreed to pay the Hattons a total of $367,976.45 for fees and costs. No security was executed as to this debt; the court finds it is unsecured as to Hernández Ortiz.

The "Renewal Agreement" provides that, as additional security for the debts therein, the parties are executing "Contratos Sobre Limitación De Crédito Hipotecario y Constitución de Prenda Secundario" and an "Acuerdo Sobre Limitación de Creditor Hipotecario y Constitución de Prenda Secundaria" through which Llanos del Sur Corporation, whose president is Hernández Torres, pledges a mortgage in the amount of $450,000.00 over four parcels of land to the Hattons. It appears from the documents evidencing this transaction that this property was pledged by Llanos del Sur Corporation, not Hernández Ortiz, and therefore does not constitute a security interest given by him.

Therefore, as of the date of the "Renewal Agreement", Hernández Ortiz' debt to the Hattons totals $5,600,339.89 in unsecured debt ($1,227,504.00 re: the first loan, $3,269,684.50 re: the second loan, $231,121.96 re: the management agreement, $504,052.98 re: the financial agreement and $367,976.45 re: the additional agreement) and $1,595,000.00 in secured debt ($100,000.00 re: the first loan, $975,000.00 re: the second loan, and $520,000.00 re: the management agreement). To this total we must add $661,440.76 in interest as of the filing date of the petition, as per proof of claim no. 13, for a total of $7,856,780.65. The allocation of said interest between secured and unse-

cured debt must be determined. The classification of portions of this debt as "secured" and "unsecured" is subject to the verification of the value of the collateral securing said debts, and from this claim total must be subtracted any payments received by the Hattons on their claims during the course of these bankruptcy proceedings, as well as any payments received from the estates of Inabón and Hernández Torres on the claims filed in those cases.

### Discussion

#### A. Res Judicata/Collateral Estoppel/Issue Preclusion

The defendants argue the issues herein have already been decided by the Court of First Instance of the Commonwealth of Puerto Rico on August 7, 1996, and that said adjudication is final, firm and unappealable, and are therefore *res judicata* to the claims in this adversary proceeding. Debtors filed a civil action against defendants in a case captioned *Empresas Inabón, Inc. v. Robert Hatton Gotay,* case no. JPE 96–0011, in Ponce, Puerto Rico. Two related cases, *Robert Hatton Gotay v. Empresas Inabón, Inc.,* case no. JPE 96–0015, and *Robert Hatton Gotay v. ALRA Construction Company,* case no. JPE 96–0016, were settled, the agreements written in two documents entitled "Acuerdo" and "Estipulación de Sentencia por Transacción". According to defendants, the debtors admitted in said agreements that the averments in their complaint were incorrect and that defendant's averments in the counterclaim were a correct and truthful account of the events that took place between the parties.

■■■ The doctrine of *res judicata* bars parties from litigating or re-litigating any issue or claim that has already been adjudicated in a prior case. *Suarez Cestero v. Pagan Rosa,* 198 F.Supp.2d 73, 84 (D.P.R. 2002); *Del Carmen Tirado v. Department of Education,* 296 F.Supp.2d 127, 130

(D.P.R.2003). The preclusive effect of a state court judgment depends upon state law. *Kane v. Town of Harpswell (In re Kane),* 254 F.3d 325, 328 (1st Cir.2001), citing *Cruz v. Melecio,* 204 F.3d 14, 18 (1st Cir.2000); *see also, Suarez Cestero v. Pagan Rosa,* 198 F.Supp.2d at 85 ("[I]f Puerto Rico courts would give preclusive effect to the judgment of a state court, then this Court must also give preclusive effect to said judgment."). Additionally, whether a state court judgment is final for preclusion purposes (claim or issue) is a question of state law. *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico,* 410 F.3d 17, 22 fn. 8 (1st Cir.2005), citing *Roy v. City of Augusta,* 712 F.2d 1517, 1520 (1st Cir.1983). "In Puerto Rico, judgments can be given preclusive effect if they are final and on the merits." *Suarez Cestero,* 198 F.Supp.2d at 85.

■■ In the case at bar, Empresas Inabón filed its petition for reorganization under chapter 11 of the Bankruptcy Code on August 6, 1996. The partial judgment approving the stipulations entered in the cases before the Superior Court of Ponce was entered on August 7, 1996. Therefore, the partial judgment of the Superior Court is not *res judicata* to the issues raised in this proceeding as they relate to debtor Empresas Inabón. *See In re Soares,* 107 F.3d 969, 978 (1st Cir.1997) (holding that a state court foreclosure judgment entered post-petition is null and void because of the automatic stay provisions of 11 U.S.C. § 362). However, the partial judgement approving the stipulations is *res judicata* to the issues raised in this proceeding as to Hernández Torres and Hernández Ortiz.

#### B. Contracts and Obligations under Puerto Rico Law

The debtors argue that the defendants' actions in coercing them to sign the man-

agement agreement and settlement agreement constitute intimidation and duress and, as a result, said contracts are invalid under Puerto Rico law. The Hattons argue that the documentary and testimonial evidence submitted to the local court in support of the settlement agreement establish that the parties freely negotiated and executed a settlement agreement, with the assistance of legal and financial counselors; the settlement agreement constitutes a binding contract with respect to all facts and issues presented to the bankruptcy court; and the parties cannot now claim deceit as to the financial agreements. According to the Hattons, if there is no deceit, error or violence in the settlement agreement, said agreement is a binding contract on the parties to it, and it can only be annulled if there are defects in the consent which invalidate the contract according to law. Civil Code of Puerto Rico, Art. 1252 (1930), 31 L.P.R.A. § 3511 (1991). According to the Hattons, the debtors, who are experienced, well-educated and wealthy individuals, with legal and financial advisors, have not established that they were intimidated into executing the settlement agreement.

Under Puerto Rico law, a contract exists from the moment that one or more persons consent to bind themselves to others, to give something or to render some service. Civil Code of Puerto Rico, Art. 1206 (1930), 31 L.P.R.A. § 3371 (1991). Parties may enter into any type of contract that they deem advisable as long as it does not contravene the law, moral standards or public order. Civil Code of Puerto Rico, Art. 1207 (1930), 31 L.P.R.A. § 3372 (1991).

In addition to being within the boundaries of law, morals and public order, it is also necessary that all contracts have valid consent of the parties, a definite object which is subject of the contract, and cause for the obligation. Civil Code of Puerto Rico, Art. 1213 (1930), 31 L.P.R.A. § 3391 (1991). A contract is binding as soon as it is perfected, and perfection occurs when the parties come to an agreement regarding cause, object and consent. Civil Code of Puerto Rico, Art. 1210 (1930), 31 L.P.R.A. § 3375 (1991). Once perfected, the contract is law between the contracting parties and can only be annulled if there are defects which invalidate them according to law. Civil Code of Puerto Rico, Art. 1252 (1930), 31 L.P.R.A. § 3511 (1991).

Consent to a contract is void if it is given by error, under threat of violence, by intimidation or as a consequence of deceit. Civil Code of Puerto Rico, Art. 1217 (1930), 31 L.P.R.A. § 3404 (1991). Error sufficient to invalidate consent must refer to the substance of the object of the contract, or its conditions, which are the cause of its execution; error with regard to a person can only invalidate a contract when the consideration of that particular person was the principal cause of the contract. Civil Code of Puerto Rico, Art. 1218 (1930), 31 L.P.R.A. § 3405 (1991).

Violence exists when irresistible force is used to extract consent; intimidation exists when one of the parties has a reasonable and well-grounded fear of suffering an imminent and serious injury to his person or property, or that of his spouse or descendants. Civil Code of Puerto Rico, Art. 1219 (1930), 31 L.P.R.A. § 3406 (1991). Intimidation can be found if the following are established: a state of apprehension that compels consent; said apprehension is provoked by the actions of another; the apprehension is rational and well-grounded; the apprehension refers to an injury that the subject will suffer unless he enters into the contract; and the intimidatory actions are anti-juridical. *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank,* 954 F.Supp. 438, 450 (D.P.R.1996),

citing M. Albaladejo, *Comentarios al Código Civil y Compilaciones Forales* Tome 17, Vol. 1–B, p. 348 (Editorial Revista de Derecho Privado 1993).

Additionally, the three fundamental elements of intimidation under Article 1219 of the Civil Code have been described as: "(a) That one of the contracting parties be threatened with a serious and imminent harm that would therefore *exert profound influence on his mind.* (b) That this threat determines the declaration of intent, or what is the same, *that there exists a causal nexus between the intimidation and the consent.* (c) That the repeated threat and effect on the will *has shadings of illegality; and cannot, therefore, be deemed the unlawful consequence of a rightful and nonabusive use of rights." Nassar Rizek v. Hernandez,* 123 D.P.R. 360, 369, 123 T.S.P.R. 333, 344, 1989 WL 607319 (1989), quoting VIII–2 J.M. Manresa, *Comentarios al Código Civil español* 575, Madrid, Ed. Reus (1967) (emphasis in original). In *Nassar,* the Puerto Rico Supreme Court concluded that an attorney's threat to withdraw from a case was not *per se* an intimidating act although, at a critical stage in the litigation, it could constitute coercion sufficient to vitiate consent. *Id.* The Court stated "[t]he issue requires that we examine all the pertinent factors, especially the threatened person's state of mind, since '[t]he threatened person is, by reason of his character, sex, status, age, or profession, capable of resisting threat from whatever quarter, yet others, similarly threatened would, because of weakness, ignorance, inexperience, or need, make coercion possible, especially when those who voice such threat are in a position to carry it out, hence, weighing this modality of intimidating force cannot be established as a general criterion, but as one that takes into account the specific facts of each case." *Id.* at 345, quoting Manresa at 577. The Court concluded

that the lower court did not err in finding the contract at issue valid because the complaining party's deposition shows that he "admitted to reading and voluntarily signing such documents", "freely and spontaneously consented to the same", "his decision was neither careless nor irreflexive" and "he was fully aware of the consequences". *Id.*

▇▇▇ Deceit may be found when a person is induced by words or insidious machinations to execute a contract they would not have otherwise entered into. Civil Code of Puerto Rico, Art. 1221 (1930), 31 L.P.R.A. § 3408 (1991). In order to nullify a contract, deceit must be serious and must not have been used by both of the parties. Civil Code of Puerto Rico, Art. 1222 (1930), 31 L.P.R.A. § 3409 (1991). Furthermore, if the deceit is not serious, but incidental, the party who employed it is only liable to indemnify for losses and damages. *Id.* "The intentional fault or bad faith of a person charged must be established, inasmuch as good faith is always presumed." *Citibank, N.A. v. Dependable Insurance Co., Inc.,* 121 D.P.R. 503, 21 P.R. Offic. Trans. 496, 512 (1988), quoting *Canales v. Pan American,* 112 D.P.R. 329, 339 (1982). "A person's education, his social and economic status, his relations, and the type of business in which he is engaged are significant when trying to determine the existence of 'dolus' that would void his consent." *Id.,* quoting *Mirando Soto v. Mena Ero,* 109 D.P.R. 473, 478, 1980 WL 138572 (1980). In *Citibank,* the Supreme Court of Puerto Rico found that there was no willful malice or bad faith, noting:

The agreement was drawn after several meetings between competent individuals, knowledgeable in banking and insurance matters, advised by their respective attorneys. In these meetings they discussed the terms of the settlement and

the parties had access to the information pertinent to the same. Citibank had the opportunity of examining, studying, and reviewing the settlement before it was signed. It agreed with the clear wording used.

*Id.* at 513 and 514.

██ The court finds that the agreements entered into among the parties constitute valid contracts under Puerto Rico law. Even though the "management agreement" of January 24, 1996 may have been signed under duress due to Hernández Torres' physical and mental condition, as well as his economic condition, the subsequent agreements signed on June 2, 1996, June 18, 1996, September 7, 1996 and May 15, 1997, were signed with the advice of professionals. The debtors did not establish that their consent to those agreements was given in error, or under threat of violence or intimidation, or as a result of deceit. That the terms of the agreements may be disadvantageous to debtors does not necessarily mean that they are, under the circumstances, unconscionable and illegal. Clearly, upon being unable to comply with the repayment of the loans and the agreement incorporating the same, debtors sank continuously deeper into debt, dissipating what at one time should have been substantial equity in their aggregate assets. However, the debtor's dire economic needs are not the equivalent of economic harm caused by Hatton's supposed undue economic leverage over the debtors. The end result is sad, but was not coerced nor illegal.

### C. Settlement and Compromise

The Hattons argue that even if the court finds that the present action is a different claim than that raised in the local court proceedings, and therefore the doctrines of *res judicata* and collateral estoppel do not apply, all of the facts that would need to be litigated in the present action have already been litigated, stipulated and settled by the partes, and said determination is fully binding to all parties herein and this court.

A settlement agreement, or compromise, is a contract by means of which each of the parties in interest, by giving, promising, or retaining something—i.e., through reciprocal concessions—avoids the provocation of a suit, or terminates one that has already been instituted. Civil Code of Puerto Rico, Art. 1709 (1930), 31 L.P.R.A. § 4821 (1991); *Hidalgo v. Blás Toledo,* —— D.P.R. ——, 2006 T.S.P.R. 47 (March 30, 2006); *Neca Mortgage Corp. v. A & W Dev. S.E.,* 137 D.P.R. 860, 1995 P.R.-Eng. 905586 (1995). One commentator has defined a compromise as "a consensual, mutually binding contract, with a subjective consideration, having a determinant or declaratory effectiveness, through which the parties exercise their discretion to, via mutual waivers and releases, and sometimes complementary payments, settle a justiciable legal controversy." *Citibank,* 21 P.R. Offic. Trans. at 504–505, quoting A. Moxó Ruano, Notas sobre la naturaleza de la transacción, 34 Rev. Der. Priv. 673 (1950).

██ In order for a contract to be considered a compromise, there must be a controversy between two or more persons and the need for mutual concession. *Hidalgo, id.* at p. 10 [43]; *Neca, id.* [44] In *Citibank,* the Supreme Court of Puerto Rico quoted Spanish commentator Albaladejo, who identifies three essential elements of a settlement or compromise; first, an uncertain legal relationship; second, an intent to

---

**43.** Page references are not to the official publication.

**44.** Publication page references are not available from Westlaw for the English translation of *Neca.*

eliminate uncertainty; and third, reciprocal concessions must be made. 21 P.R. Offic. Trans. at 506, citing XXII–2 M. Albaladejo, Comentarios al Código Civil y compilaciones forales 11, Madrid, Ed. Rev. Der. Privado (1979).

■ There are two types of settlement or compromise agreements, judicial and extrajudicial. *Neca, id.* Extrajudicial are those voluntarily agreed to by the parties before the commencement of a civil action, or entered into during the pendency of a lawsuit, without seeking the court's intervention. *Id.* However, if the parties move to incorporate the settlement agreement into a legal action already in progress, the settlement becomes judicial. *Id.* Whether it is judicial or extrajudicial, in order to be valid the settlement or compromise must meet the requirements of a contract established in the Civil Code of Puerto Rico, Article 1213 (1930), 31 L.P.R.A. § 3391 (1991); that is, there must be consent (consensus of the settling parties), object (the controversy between the parties) and cause (the termination of the controversy through mutual concession). *Id.*

■ A compromise or settlement agreement is binding and enforceable, and has the same authority of *res judicata;* the parties must consider the points discussed to be definitely resolved and cannot go over them again. Civil Code of Puerto Rico, Art. 1715 (1930), 31 L.P.R.A. § 4827 (1991); *Hidalgo,* at p. 7; *Neca; Citibank,* 21 P.R. Offic. Trans. at 508–509. However, even though a settlement agreement has *res judicata* effect as to the matters addressed therein, it does not impede the court from considering its extent and application to a legal proceeding where it has been raised as a defense. *Hidalgo, id.; Citibank,* 21 P.R. Offic. Trans. at 510. Settlement agreements should be interpreted restrictively. *Id.* at 10. Settlement agreements should be interpreted in

accordance with the general rules of contract interpretation, pursuant to which the settlement contract should not be understood to include things that were not intended by the parties to be included and, further, if the terms are clear they should be literally applied. *Id.* at 12. Finally, to discern the intent of the parties, the court should consider the parties' actions before, during and after the settlement contract, as well as any other circumstances which indicate their volition. *Id.*

In *Neca,* the Supreme Court of Puerto Rico observed "[i]t has been extensively discussed whether the compromise should have the same effect as the final judgment-that is, the authority of res judicata-or if, on the contrary, it should merely constitute a contract like any other contract that requires a new litigation for its enforcement, in default of its performance." The Court concluded that the language of Article 1715 of the Civil Code means that "the parties must consider the points discussed [in the compromise] as definitely resolved and cannot go over them again". *Neca,* citing *Citibank v. Dependable Ins. Co., Inc.,* 121 D.P.R. 503, 516, 21 P.R. Offic. Trans. 496, 508–509 (1988). The Court further concluded that whether a compromise is judicial or extrajudicial affects how it may be enforced and what remedies are available for its breach, noting that only a judicial compromise gives rise to an action for summary judgment or, in other words, may be enforced as if it were a final judgment through an execution of judgment proceeding. *Id.*

In *Citibank,* the Supreme Court of Puerto Rico, quoting Spanish commentator Albaladejo, states "an out-of-court settlement is not legally binding and cannot be fulfilled unless declared legally effective by a court..., but it does have the authority of res judicata, which...'must be construed and understood to the effect that

once the settlement is agreed, it would be illegal to raise agreements or clauses, defects, positions or circumstances which could affect the legal relationships." 21 P.R. Offic. Trans. at 509, citing Albaladejo at 55. The Court, citing another commentator, further states "[t]he res judicata of the settlement [contrary to the res judicata resulting from a judgment]...means that the judge is obliged to take into account the parties' decision and not oppose the same although he may deem it unfair." *Id*, quoting 43–2 A. Gullón Ballesteros, La transacción-Tratado práctico y critico de Derecho Civil 139, Madrid, Inst. Nac. Est. Jur. (1964). The Court concluded "[t]he controversy in the case at bar concluded when the parties signed the settlement" and "[t]he trial court erred in refusing to give finality, res judicata effect, to the already culminated process." *Id.* at 510.

▪ The court finds that the agreements entered into by the parties were consensual, entered into with knowledge of their consequences, with the advice of professionals, and albeit onerous, legally binding. The basic intent of the series of agreements was to terminate complex and costly litigation between the parties and resolve the issues among them; hence, they constitute a settlement or compromise under Puerto Rico law. Consequently, they are entitled to be given *res judicata* effect to the issues raised herein.

### D. Interest rate and Rule 26–A

▪ The Hattons argue that Inabón cannot claim that the interest rates provided for in the loans and settlement agreement are usurious, nor allege that their loans are subject to a maximum allowed interest rate for commercial loans guaranteed by a mortgage under Rule 26–A of the Regulations of the Commissioner of Financial Institutions, for several reasons. First, the Hattons argue that the interest rate was subject of the settlement agreement, and therefore the debtors are barred by the doctrines of *res judicata* and collateral estoppel from raising it again. Second, they argue that a corporate borrower is barred by Puerto Rico law from raising usury as a defense in a collection action. Third, they argue that Regulation 26–A does not apply to corporations organized under Article 102(a) and (b) of the General Law of Corporations, and that Inabón is such a corporation.

Section 3134 of the General Corporation Law provides that a corporation may borrow money at any interest rate which it deems acceptable, and that a debtor corporation may not plead usury in any legal proceeding to enforce payment of said loan. 14 L.P.R.A. § 3134 (1995). The third article of Regulation 26–A specifically excepts corporations organized under paragraphs (a) and (b) of the General Law of Corporations of Puerto Rico from the regulation.

The original loan at issue herein was made by SOMO to Inabón; Rule 26–A does not apply to that transaction because Inabón is specifically exempted from its application, as well as by the provisions of 14 L.P.R.A. § 3134 (1995). Rule 26–A does not apply to the subsequent financial agreements between the parties because the financing therein was provided by Hatton, not by a financial institution.

### E. Secured Claims and the Recovery of Interest and Reasonable Fees and Costs

The Hattons seek to recover interest, as well as various fees, costs and charges, as part of their claims in the debtors' cases. According to the Hattons, their claims arise from the "acuerdo", settlement agreement and the renewal thereof, entered into between the debtors and the Hattons, and that said agreements provide

for the charges, fees and costs being claimed by them. The Hattons argue that the charges are reasonable and appropriate for several reasons, and that the debtors have not presented any evidence to show that they are unreasonable.

■ Section 506(b) of the Bankruptcy Code applies to the allowance of postpetition interest, fees, costs and charges on an oversecured claim, and provides that:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest, on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). Generally, these items will not be allowed unless a claim is "oversecured", which means that "the relevant value of the collateral exceeds the amount of the claim after taking into account any amounts chargeable to the collateral under section 506(c)." 4 Lawrence P. King, et al., *Collier on Bankruptcy* ¶ 506.04 (15th ed. rev'd 2006). Postpetition interest on an oversecured claim will be allowed at the rate specified in the contract, or under applicable nonbankruptcy law, while postpetition fees, costs and charges will be allowed subject to a determination as to their reasonableness. *Id.* at 506–101.

For the purposes of § 506(b), an allowed secured claim is an allowed claim that qualifies as secured under § 506(a). *Id.,* ¶ 506.04[1] at 506–102. The amount of a claim is generally determined as of the petition date and includes principal plus prepetition interests, fees, costs and charges owing as of the petition date, pursuant to section 502 and other provisions of the Code. *Id.*

■ "A secured claim is 'oversecured' to the extent that the value of the creditor's interest in the estate's interest in property is greater than the amount of the creditor's allowed prepetition claim." *Id.,* citing *Baybank–Middlesex v. Ralar Distributors. Inc.,* 69 F.3d 1200, 1202 (1st Cir.1995). Any portion of postpetition interest and allowed fees, costs or charges that exceed the oversecured amount would not be allowed as part of the secured claim under § 506(b) but, rather, excess postpetition fees, costs and charges constitute an unsecured claim against the estate, and excess postpetition interest is subject to disallowance under § 502(b)(2). *Id.*

In *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Supreme Court held that § 506(b) applies to both consensual and nonconsensual liens, the former being those created by agreement between the debtor and creditor, and the latter being judicial or statutory liens fixed by operation of law and without the consent of the debtor. *Id.* at 240, 109 S.Ct. 1026. The court reasoned that the term "agreement" in § 506(b) refers only to fees, costs and charges, but not to interest; therefore, fees, costs and charges cannot be allowed in the absence of contractual agreement, but interest will be allowed if it is provided for under the contract or applicable law. *Collier.* ¶ 506.04[2][a] at 506–108.

Most courts hold that postpetition interest under § 506(b) should be computed at the contract rate of interest—that is, the rate provided in the agreement or other applicable non-bankruptcy law. *Collier,* ¶ 506.04[2][b][I], citing *In re Courtland Estates Corp.,* 144 B.R. 5, 9 (Bankr. D.Mass.1992). Where the contract does not specify an interest rate, the court may look to applicable state law. *Id.* Courts have also allowed a default rate of interest,

interest on interest, late charges and prepayment charges when the same are provided for in the contract and not unenforceable under applicable nonbankruptcy law. *Collier*, ¶ 506.04[2][b][ii].

Section 506(b) provides for the allowance of fees, including attorney's fees, costs and charges as part of an oversecured creditor's allowed secured claim, provided that they are reasonable and provided for under the agreement or state statute. *Collier*, ¶ 506.04[3], citing *Mann v. Chase Manhattan Mortg. Corp.*, 316 F.3d 1, 5 (1st Cir.2003). Courts are split over whether state or federal law applies to the determination of the validity of a contractual provision requiring the payment of attorney's fees. *Collier*, ¶ 506.04[3][a]. The referenced treatise suggests that while the application of state law may be assumed to be the proper method of determining attorney's fees claims, as is done under § 502(b)(1), the legislative history suggests that attorney's fees claims may be allowed, even though not valid under state law, if they are provided for in the agreement. *Id.* If the claim for attorney's fees is valid under state law, then it must be allowed under § 502 and included as part of the oversecured claim, to the extent of the oversecurity, provided that the amount is reasonable. *Id.* Reasonableness of attorney's fees is determined according to federal law. *Id.* at ¶ 506.04[3][a][ii], citing *In re A.J. Lane & Co.*, 113 B.R. 821, 823–25 (Bankr.D.Mass.1990).

Generally, allowed postpetition interest, fees, costs and charges will accrue unpaid until the secured claim as a whole is paid—for example, from the sale of collateral, or as provided for in the plan, or pursuant to any underlying agreement not affected by the bankruptcy. *Collier*, ¶ 506.04[4].

Although § 506(b) allows courts to limit other costs, fees and charges, including the default interest rate, courts recognize the important of enforcing the contract rights the parties bargained for as closely as possible. *In re Terry. L.P.*, 27 F.3d 241 (7th Cir.1994); *see also, In re Glenn S. Dixon*, 228 B.R. 166 (W.D.Va.1998) (allowing 36% interest rate as it was a lawful transaction between sophisticated parties and did not harm any third parties and no negative impact on reorganization).

 The Hattons argue that their claimed interest, fees, costs and charges should be allowed pursuant to § 506(b), and further argue that section applies to their claims because the value of the property(ies) securing their claim is greater than the amount of their claim(s). All of the parties to this litigation assumed that this was the case, and presented their positions accordingly. Although the expert who testified on the matter, accountant Villamil, stated that, in his opinion, the interest, fees, costs and charges contained in the parties' agreements were reasonable under the circumstances, they may only be allowed if the creditor is, in fact, oversecured. The court and the parties now realize and recognize that this may not be the case. Accordingly, although the court may find that the interest, fees, costs and charges claimed by the Hattons and provided for in their agreements with the debtors are reasonable, it is not in a position to find that they are actually recoverable.

### Conclusion

The debtors' complaint raised nine causes of action. The first cause of action requests that the court disallow Hatton's claims in their entirety and rescind the four agreements because they are against public policy due to Hatton's unconscionable and overreaching negotiation tactics; said request is denied for the reasons previously stated herein, including this court's finding that Hernández Torres is an expe-

rienced businessman who, along with Hernádez Ortiz, executed the financial transactions at issue in consultation with financial and legal professionals. The second cause of action requests that the court disallow Hatton's claims in their entirety because the agreements upon which they are based are void and unenforceable under the Civil Code of Puerto Rico; said request is denied for the reasons previously stated herein, including the court's finding that the financial agreements were executed in accordance with the provisions of Puerto Rico law related to contracts and obligations.

The third cause of action requests that the court disallow Hatton's claims in their entirety and declare the financial agreements void and unenforceable as they violate Rule 26–A; said request is denied for the reasons previously stated herein, the court finding that Rule 26–A does not apply to Inabón nor to Hatton. The fourth cause of action requests that the court disallow Hatton's claims and to rescind the financial agreements upon which they are based as a result of Hatton's breach of fiduciary duty to the debtors; said request is denied as the debtors did not establish that Hatton owed or breached a fiduciary duty to them.

The fifth cause of action requests that the court disallow Hatton's claims in their entirety because the debtors were fraudulently induced into executing the financial agreements upon which they are based; said request is denied for the reasons previously stated herein, the court having found that the agreements were executed with professional advice and that the debtors did not establish that their consent to the agreements was given in error, under threat of violence or intimidation, or as a result of deceit. The sixth cause of action requests that the court disallow Hatton's claims in their entirety because SOMO and Hatton converted some of the loan proceeds for their personal use; said request is denied as these allegations were not established at trial.

The seventh cause of action requests that the court disallow Hatton's claim as it relates to penalties under the Management Agreement and/or declare the Management Agreement void and unenforceable pursuant to 11 U.S.C. § 502(b)(4); said request is denied as the debtors did not establish the applicability of § 502(b)(4) to the Management Agreement. The eighth cause of action requests that the court disallow Hatton's claims against the individual debtors in their entirety because the agreements upon which they are based are void, unenforceable, improper and unreasonable under 11 U.S.C. § 506(b). As discussed above, § 506(b) allows for the recovery of *post-petition* interests, fees, costs and charges on an *over-secured* claim. Post-petition interest is allowed at the contract rate, while fees, costs and charges are allowed if reasonable. As the court has previously found, although Hatton's expert testified at trial that the fees, costs and charges were reasonable, the court is allowing the Hatton's claims as of the dates of the filing of the respective bankruptcy petitions; in order to recover post-petition interest, fees and costs, Hatton must establish that he was oversecured as to each of the debtors, and to what extent.

The ninth cause of action requests that the court disallow Hatton's proof of claim against Hernández Ortiz and find that the amount due and owing is $343,791.31, plus interest. Said debt arises from a mortgage note executed by Hernández Ortiz on November 15, 1995 in the amount of $1,000,000.00, and pledged to Shell company PR, Ltd. (Shell) on February 19, 1997 in guarantee of a debt owed by Inabón to Shell, said obligation being subsequently reduced by the partial sale of the property collateralizing the debt, and said note hav-

ing been assigned by Shell to Hatton, at which time, according to Shell, the amount owed was $343,792.81. This cause of action was not included by the parties as an issue for trial in their pre-trial report filed on November 15, 2004 (dkt.# 54), nor was it addressed by the debtors in their proposed findings of fact and conclusions of law filed on January 10, 2005 (dkt.# 65) nor their post-trial memorandum of law filed on July 26, 2005 (dkt.# 91). Consequently, the ninth cause of action is dismissed.

The court finds that, as of the date of the filing of its bankruptcy petition on August 6, 1996, Inabón owed the Hattons $4,523,894.76, an amount jointly owned by Hernández Torres and Hernández Ortiz as guarantors of said debts. The court finds that said claim is composed of $1,403,699.00 in unsecured debt and $3,006,900.00 in secured debt [45], plus $113,295.59 in interest as of the date of the filing of the petition; the allocation of said interest between secured and unsecured debt must be determined. Since the Hattons' claim against Inabón is not oversecured, they are not entitled to post-petition interest, fees and costs.

The court further finds that, as of the date of the filing of their bankruptcy petitions on December 7, 1997, the amount which Hernández Torres and Hernández Ortiz owed to the Hattons had increased to $7,856,780.65, jointly owed with Inabón. Said amount is unsecured in its entirety as to Hernández Torres. As to Hernández Ortiz, the court finds that said claim is composed of $5,600,339.89 in unsecured debt and $1,595,000.00 in secured debt [46], plus $661,440.76 in interest as of the date of the filing of the petition; the allocation of said interest between secured and unsecured debt must be determined. Since the Hattons' claim against Hernández Ortiz is not oversecured, they are not entitled to post-petition interest, fees and costs.

In order for the court to make a final determination as to the amount of the Hattons secured and unsecured claims in each of the three captioned bankruptcy cases, the Hattons shall submit to the court within thirty (30) days a re-calculation of the interest on the secured and unsecured portions of their claim against Inabón and Hernández Ortiz. Further, they shall submit evidence of the value of the properties securing their claims in support of the secured status of their claims. The Hattons shall also submit a calculation of all payments received through the three bankruptcy proceedings to date, indicating to which estate's claims they should be applied. Debtors have thirty (30) days to reply.

SO ORDERED.

---

**45.** Said finding is conditioned upon the establishment of the value of the properties securing the debt.

